# Darby *v.* The State.

## *Indictment for Murder.*

1. *Objections to special venire; duplicating name of juror.*—The presiding judge having drawn from the jury-box, in open court, the names of fifty persons to serve, with the regular jury for the week, in the special *venire* for the trial of a capital case, the fact that one of the persons so drawn is also one of the regular jurors for the week, is good ground for quashing the *venire*.

2. *Dying declarations*, having been committed to writing by the person to whom they were made, but not signed by the declarant, nor read over to him, may be proved by the testimony of the person who wrote them down, without producing the paper, or proving its loss.

FROM the Circuit Court of Butler.

Tried before the Hon. JOHN P. HUBBARD.

The appellant in this case, April Darby, was jointly indicted with O. R. Odell, George Howard, Adam Knight and Sam Butler, for the murder of one Henry Walker, by shooting him with a pistol. Before entering upon the trial, the defendant requested a severance, which was granted by the court; and he was tried and convicted of murder in the second degree, and sentenced to the penitentiary for a term of ten years.

A motion was made by the defendant to quash the *venire*. The grounds of this motion, and the rulings of the court thereon, are sufficiently set forth in the opinion of this court. Upon the trial of the case, as the bill of exceptions states, "there was some evidence tending to show that there was a conspiracy or combination between Odell, George Howard, Adam Knight and Sam Butler, to commit the crime charged

againt this defendant; and they were indicted with this de-
fendant.　It was in evidence that Adam Knight was the night-
walker of the railroad track, and that he, Sam Butler and
George Howard were section-hands on the railroad, working
under Odell, who was the 'boss' of the section."

Daniel Harrison was introduced as a witness by the State,
for the purpose of proving what were alleged to be the dying
declarations of the deceased, Henry Walker; and after testi-
fying that he was a justice of the peace, and after describing
the location and surroundings of the room in which he found
Walker, he further testified, as is stated in the bill of excep-
tions:　"I asked Henry Walker, as I entered, if he had sent
for me, and he answered that he had.　I then asked him what
he wanted, and he said he had sent for me, and wanted me to
take down his testimony; that he was going to die, and had
sent for me.　He seemed to be in great pain.　I took down
his testimony in writing, which I left in the grand jury room,
when I was before the grand jury in this case."　The examina-
tion of the witness Harrison was here interrupted, and, upon
the request of the solicitor, Mr. Shell, the clerk of the Circuit
Court, was introduced as a witness, and the solicitor asked
him, "What became of that paper?" referring to the paper on
which Harrison wrote the statements made to him by Henry
Walker.　The defendant objected to this question, on the
ground that it called for illegal evidence; but the court over-
ruled his objection, and the defendant duly excepted.　Upon
the witness answering that he did not know what had become
of the paper referred to, the solicitor then asked him, "Has
search been made for it recently?"　To the overruling of his
objection to this question, the defendant again excepted.　The
witness answered, that he had searched for it; and the solicitor
then asked him the following question:　"You searched for it
to-day, and did not find it?"　The defendant objected to this
question because illegal, and duly excepted to the overruling
of his objection.　The witness answered, "Yes."　The bill of
exceptions continues, "Mr. Harrison then resumed the witness
stand, and was asked by the solicitor: 'State as near as you
can recollect what Henry Walker said to you, as to who shot,
how it was done, and who did it.'　To this question the de-
fendant objected, because the same was illegal, and called for
illegal testimony."　The court overruled the objection, and
the defendant duly excepted.　This witness then told the
statements Henry Walker had made to him, and which he had
written down at said Walker's instance on the Sunday morn-
ing after he was shot—the said Walker being shot Saturday
night, and having died the following Thursday.　The defend-

ant separately and severally objected to each of said statements as testified to by Harrison, and duly excepted to the overruling of each of his objections. The said Harrison also testified on cross-examination, that before the statements were made to him the morning after the shooting, Henry Walker "said he was very tired and dull, and asked another darkey to help him move; said he was bound to die. Told witness he had sent for him to take down his testimony, as he was bound to die."

Upon the introduction of one West Barnes, he testified that, on the night the deceased was shot, Adam Knight came to his house shortly before the shooting occurred; that soon after he came there, Henry Walker, the deceased, called to him, Barnes, and asked him to come over to his house; that Barnes answered he would come as soon as the rain was over; and that soon after, they heard pistol shots, and that said Walker called to him again to come over, saying he was shot. This witness and his wife, who was also introduced as a witness, testified that said Adam Knight, on being asked why he was so wet, said that "he had been dodging the captain, so as not to walk the track; and that he went to Henry's house, but Henry would not let him in;" and that when the shots were heard, Adam Knight said: "There is a shooting out there some where." All of this testimony was severally and separately objected to, and its introduction duly excepted to. On the introduction of one Alex. Thomas, who was in jail under a conviction of grand larceny, he testified, against the objection and exception of the defendant, to certain voluntary confessions made by the defendant to him while they both were in jail, in which defendant admitted that he committed the crime for which he was indicted. This witness also testified that he and the defendant had very often quarrelled while they were in jail, and that defendant "threatened him, and said he would have him lynched if he told anything about him." One Neal was also introduced as a witness for the State, and testified that, while he was in jail, he heard angry words between Alex. Thomas and the defendant, and had heard the defendant tell Thomas in an angry voice, "If you tell anything you hear, I will have you lynched." The defendant severally objected to each portion of the testimony of both Thomas and Neal, and excepted to the overruling of his objections.

Charlie Lane, another witness for the State, was introduced; and after testifying that he was on the train, and saw Odell "and a large colored man" talking together on the train, and that they both got off the train together at Searcy Station, the place where the killing occurred, he was asked if he heard what

[Darby v. The State.]

Odell and the colored man were talking about, to which he answered: "I heard him ask Odell where his brother was, and what he was doing." The defendant objected to each portion of this testimony, and excepted to the court's overruling his separate objections, and allowing the testimony to be introduced.

There were many charges asked by the defendant and refused by the court, to which separate exceptions were reserved; but the opinion of this court renders it unnecessary to state each of these charges in detail.

GAMBLE & POWELL, for appellant.—The alleged dying declarations were not admissible.—*Mose v. State*, 35 Ala. 421; *Johnson v. State*. 50 Ala. 456; *Walker v. State*, 52 Ala. 192; *Johnson v. State*, 17 Ala, 618; *Oliver v. State, Ib.* 587.

WM. L. MARTIN, Attorney-General, for the State.—The dying declarations were properly admitted.—*Hamil v. State*, 90 Ala. 577; *Pulliam v. State*, 88 Ala. 1.

McCLELLAN, J.—The record of the trial court shows that, more than one day before the day set for the trial, the court, the defendant being present, "caused the box containing the names of jurors to be brought into the court-room, and, after having the same well shaken, the presiding judge then and there publicly drew therefrom fifty of said names for this case; and a list thereof was immediately made out by the clerk of the court, and an order was issued to the sheriff to summon the same to appear upon said day of trial. . . . And the court ordered the sheriff to serve the defendant with a copy of said list of jurors so drawn, and also with a list of the jurors drawn and summoned for the second week of this court," &c. On the day set for, and before entering upon the trial, the defendant moved to quash the *venire*, on the ground that one of the names drawn by the presiding judge, and put on the list of special jurors, was that of W. T. Thagard, who was on the regular panel for the week, and hence that only forty-nine special jurors, in addition to the regular panel, were in fact drawn and summoned, when the court undertook to draw fifty names, and ordered that number of jurors summoned, and a list of their names, together with and in addition to those on the panel for the week, to be served on the defendant. The motion was overruled; and that action of the court is made the basis of the first exception reserved for our consideration.

We are unable to distinguish this case in principle from that of *Roberts v. The State*, 68 Ala. 515, in respect of the point

raised in each on the motion to quash the *venire*. The question arose there under another statute, which required the presiding judge to determine upon the number of special jurors for the trial of a capital case, not less than fifty nor more than one hundred, including the regular panel, and to make an order commanding the sheriff to summon them. In the execution of the order, the selection of the special jurors was committed to the sheriff. In *Roberts' case*, the order was for one hundred. There were one hundred names on the list served on the defendant, but one of them was duplicated, so that ninety-nine jurors were in fact summoned for the trial. This was held fatal on motion to quash the *venire;* the court, by SOMERVILLE, J., observing that, so long as the order of the judge for one hundred jurors remained unrevoked, "the prisoner had the lawful right to insist that the *venire* should be constituted in accordance with such judicial direction. To have summoned *ninety-nine* persons, was just as much a violation of this order as to have summoned *fifty-nine*, the difference being in degree only, and not in the matter of spirit or substance." Under the statute obtaining with respect to the case at bar, it is as much incumbent on the presiding judge to determine the number of special jurors to be summoned, as under section 4320 of the Code which applied to *Roberts' case*, the only difference being as to the manner of evidencing the determination. There, it was by an order specifying the number, and directing them to be summoned. Here—under section 10 of the act of Feb. 27, 1888—the determination is evidenced by the fact as to the number drawn out of the box, and the order to the sheriff to summon the persons whose names are so drawn. But, in this case, as under the other statute, there is a judicial determination of the number of jurors, in addition to the regular panel, to be summoned for trial, and in each case the right of the defendant to that number is the same. The court here having determined that fifty special jurors should be drawn, summoned, &c., *in addition* to those already on the panel, attempted to effectuate the right to which the defendant was entitled by drawing fifty names out of the box; but only forty-nine of these names were in addition to the regular panel. It is true the original error was committed by the jury commissioners in putting in the box two slips containing the name of W. T. Thagard; but the box should also have contained, and we presume did contain, a list of the regular jurors drawn by the commissioners for that week, and from this it might have been ascertained that Thagard had already been drawn as a juror for the week. The judge, in our opinion, ought to have resorted to this means of assurance

[Darby v. The State.]

that he was properly executing his own order, by which the defendant was entitled to fifty talesmen; and his failure to do so, and consequent duplication of Thagard's name on the *venire*, whereby the defendant was denied one of the jurors ordered for his trial, must stand upon the same footing as a similar duplication by the sheriff acting under the order prescribed by the Code. The right to the full number being the same under both statutes, and both methods of selecting and summoning, we can not conceive it to be of any moment whether the duplication of a name, and consequent denial of the right as to one juror, resulted from the action of the sheriff under the one statute, or from the judge—discharging, as to this matter of drawing, a mere executive duty—under the other. If the *venire* would not be vitiated by one duplication, it would stand against a motion to quash if ten, or any number, or all the names of regular jurors, should be drawn as special jurors—a possibility serving to test the principle— and of course it could not be contended that a *venire* reduced in this way, as it might be, to the regular panel, or to less than twenty-five special jurors in addition to the regular panel, should be sustained and put on the defendant, in palpable emasculation of the statute.

Nor does the action complained of derive any aid, when measured by the ruling in *Roberts' case*, from the consideration that the number to be drawn was, in the discretion of the judge, between twenty-five and fifty, and that having in fact drawn forty-nine, a number within the limitation of his discretion, the defendant can not complain. It is very true that the judge might have determined upon forty-nine, but it is equally true that he did determine upon fifty; just as in *Roberts' case*, the judge might have ordered ninety-nine, but did order one hundred. Having determined on fifty, the discretion was exhausted, and defendant's right to that number was as fixed as if no discretion had existed in the first instance. Adhering to *Roberts' case*, we see no escape from the conclusion, that the motion to quash the *venire* should have been sustained.

A great many exceptions were taken in the court below to rulings on evidence. It is unnecessary to consider them in detail. Such only of them as appear to have been of doubtful propriety will be discussed. Of this class were the rulings on the competency of the dying declarations, and other testimony, as to what passed between the deceased before the shooting and one Barnes, to the effect that deceased called Barnes to come over to his house, the latter's reply, &c. We are unable to see, upon this record, the relevancy of this evidence to any issue in the case. The same may be said of the conver-

[Lee v. The State.]

sation between the defendant and Odell in respect to the latter's brother, and also of all that was said by Adam Knight to Barnes and his wife, about his "dodging the captain" to keep from walking the track that night, and to the effect, that "there is a shooting out there somewhere." The evidence of Neal, that he had heard angry words between defendant and Thomas in jail, is of the same character. All this testimony may, perhaps, be made pertinent on another trial, but it does not appear to be so upon this record. It was not necessary to prove the loss of the writing in which Harrison had taken down the dying declarations, it not appearing that the paper was signed by the deceased, or even shown to, or read over to him, conceding its loss was necessary to be proved had it been signed, &c., which we need not decide. Shell's evidence as to search for the paper was, therefore, irrelevant. Moreover, had it been material to prove the loss, the evidence adduced to that purpose was hardly adequate, it not appearing that such search was made for it as would have discovered it had it not been lost, and hence the search shown to have been made afforded no reasonable inference of its loss.

With these exceptions, we find no tenable objection to the action of the trial court upon the admissibility of evidence. Nor was there any error in the refusals to give the several charges asked by the defendant. They were either abstractly unsound expositions of the law, or were misleading, or confusing, or argumentative, or tended to give undue prominence to certain parts of the evidence to the obscuration of other material parts. They were all well refused.

The judgment of the Circuit Court is reversed and the cause remanded.

*Indictment for Murder.*

