# Johnson *v.* The State.

## *Indictment for Murder.*

1. *Terms of Circuit Court in Cherokee; July term, 1891.*—Under the law which was of force when the act of Feb. 14th, 1891, was passed (Sess Acts 1890–91, p. 659; Code, § 749), the courts of the 9th Judicial Circuit began in Cherokee county, on the first Monday in December, and the first Monday in July, and ended in Etowah county, on the ninth Monday after the fourth Monday in each of these months; and the July term in Cherokee was limited to two weeks. By said act of February 14th, 1891, the courts of the circuit commence in Cherokee, on the second Mondays in January and July, and the July term may continue three weeks; and there is a proviso, "that this act shall not take effect until after the Spring terms of said courts are held for the year 1891." *Held,* that the proviso had reference to the courts of the circuit then being held, or which would be held last in Etowah in April, and that the ensuing July term, 1891, of the Circuit Court of Cherokee, was governed by the new law, and might continue three weeks.

2. *Service of copy of indictment and venire.*—Under statutory provisions (Code, § 4449), service of a copy of the indictment and of the *venire,* in a capital case, may be made on the defendant personally, or on the counsel appearing for him.

3. *Juror summoned, but failing to attend; practice.*—When a person summoned as a regular juror fails to attend, and is again summoned as a special juror in a capital case. but fails to attend, the court may order the drawing to proceed, when his name is drawn, and is not required to have another person summoned in his stead.

4. *Mistake in name of juror.*—When the defendant objects to a juror whose name is drawn, on the ground that the initial letter of his middle name is variant from that contained in the copy served on him, it is the duty of the court to compare the two; and if, on such comparison, the name appear to be the same, the objection may be overruled.

5. *Evidence showing motive.*—The husband being on trial for the murder of his wife, the prosecution may, as tending to show motive, prove the existence of unlawful relations between him and another woman.

6. *Voluntary surrender as evidence.*—In a criminal case, the defendant can not make evidence for himself, by proving that he refused to flee, and voluntarily surrendered to the sheriff.

7. *Impeaching or contradicting witness.*—A witness having testified to certain declarations made by the defendant, another witness who was present at the time may be asked to give his recollection of the language used, but he can not be asked if the first witness "was not mistaken in his statement."

8. *Declarations of deceased as evidence.*—The declarations of the defendant's wife after receiving the fatal shot, to the effect that she wanted him to keep and raise the children, not being brought within the rule which governs dying declarations, nor within the principle of *res gestæ,* are properly excluded as evidence.

9. *Involuntary manslaughter; misadventure.*—If the defendant, supposing that his pistol was not loaded, was snapping or pointing it at

| | |
|---|---|
| 94 | 35 |
| 96 | 87 |
| 97 | 7 |
| 94 | 35 |
| 98 | 37 |
| 94 | 35 |
| 102 | 16 |
| 102 | 135 |
| 94 | 35 |
| 105 | 8 |
| 105 | 59 |
| 94 | 35 |
| 106 | 56 |
| 94 | 35 |
| 124 | 20 |
| 94 | 35 |
| 129 | 63 |
| 129 | 64 |
| 94 | 35 |
| 134 | 41 |
| 94 | 35 |
| 140 | 51 |
| 94 | 35 |
| 139 | 66 |
| 94 | 35 |
| 143 | 39 |
| 94 | 35 |
| 144 | 53 |

his little child, when it was accidentally discharged and killed his
wife, the killing is not misadventure, but manslaughter in the second
degree (Code, § 3731; Sess. Acts 1888-9,. p. 67), because done in the
performance of an unlawful act.

10.  *Evidence of good character; charge as to.*—In a criminal case,
evidence of good character may be sufficient to generate a doubt,
but only when considered in connection with the other evidence;
and a charge requested, instructing the jury that, "if they believe
from the evidence that the defendant is shown to be a man of good
character, that itself may generate a doubt, although none otherwise
exists," is properly refused.

11.  *Sentence to hard labor for costs.*—On conviction of a misdemeanor,
and sentence to hard labor for the county, an additional term for
costs can not exceed eight months (Code, § 4504); but this court, on
appeal, will correct the sentence, no other error intervening, and
affirm the judgment.

FROM the Circuit Court of Cherokee.

Tried before the Hon. JOHN B. TALLY.

The defendant in this case was indicted for the murder of
his wife, by shooting her with a pistol, but on the trial, after
all the evidence was closed, the prosecution announced that
the State would not ask a conviction for a higher offense than
manslaughter in the second degree; and the defendant being
convicted of that offense, he was sentenced to hard labor for
the county for three months, and an additional term of fifteen
months for the costs.  The trial was held during the third
week of the July term of the court, 1891, on a day appointed
by an order made during the preceding week; and no objec-
tion was interposed, so far as the record shows, to the juris-
diction of the court to try the case at that time.  Before
entering on the trial, "the defendant moved to quash the
*venire*, because, at the time said jury was ordered and list
made of the same, and ever since the finding of the indict-
ment, he was and had been in custody in the county jail, and
no copy of the *venire* had been served upon him personally,
but only on his attorney of record, according to an order of
the court in the case."  The court overruled the motion, and
the defendant excepted.  Other exceptions were reserved by
the defendant to the rulings of the court during the drawing
of the petit jury, as shown by the facts stated in the opinion.

On the trial, the evidence showed that the shooting occurred
on Monday, the 25th of February, 1891, and that the deceased
was buried the next day; but it was not shown how many
hours she survived the injury, and the physician who was
summoned to her testified that she was dying when he left
her, the shot having entered her left breast.  The pistol used
was a "Smith & Wesson six-shooter," which the defendant had
owned but a "short time," and which he was cleansing and
oiling, preparatory to a journey into the country to execute

[Johnson v. The State.]

some legal process in his hands as deputy-sheriff; and he had extracted five cartridges from the cylinder, not knowing or recollecting, as he said, that there was a sixth cartridge in it. Testifying in his own behalf, the defendant said: "While I was waiting for my wife to bring me the oil, my little baby came crawling along, and I snapped the pistol three or four times at it. When my wife came in with the oil, and saw me snapping the pistol at the child, she told me that I ought not to do so, and that I was too careless with a pistol. I said, 'You know it is not loaded, you saw me take out the loads.' I poured some of the oil in the hole of the cylinder axle, and commenced to rub the cylinder across my left hand, holding it by the handle in my right, when it fired. I did not have the pistol pointed at anybody or anything, I did not snap it at my wife, and did not know that it was pointing in the direction where she was." Ben Pollard, a witness for the prosecution, a near neighbor, who went to the defendant's house immediately after the shooting, testified that he asked defendant to tell him all about it, and that defendant said, "he was oiling his pistol, and snapped it several times in the face of his little child on the floor, and then at his wife, when it went off and shot her; did not remember whether he said he pulled the trigger or not." Mrs. Wilson, another witness for the State, and also a near neighbor, who went to the house soon after the shooting, testified that defendant then told her, "that he was snapping his pistol at his child, and it went off; that he did not know it was loaded; don't remember that he said he pointed it at his wife." This was all the evidence as to the circumstances attending the shooting.

Ben Pollard further testified: "Defendant told me on several occasions, shortly before [the shooting], that he had had dealings with a woman by the name of Snow, fifty times he reckoned; heard him speak of it several times." The court admitted this evidence, against the objection and exception of the defendant. Said Pollard testified, also, that when defendant was passing his own house one night, having some prisoners in custody, Mrs. Johnson, his wife, came out to the gate, and asked how long it would be before he came back; and that defendant replied, "It is none of your damned business." R. J. Young, another witness for the State, who said that he was present on the occasion mentioned by Pollard, was asked by defendant, on cross-examination, "if Pollard was not mistaken in that statement?" The court sustained an objection to this question, and the defendant excepted. "Defendant's counsel then stated to the court, that the Supreme Court had decided that such question was admissible; to which

[Johnson v. The State.]

the court replied, 'Let them decide it again.' To this remark the defendant then and there excepted, and the court withdrew the remark."

The defendant introduced several witnesses who testified to his good character, and to the pleasant relations which existed between him and his wife; and he proposed to prove by one Godfrey that, soon after the shooting, "he sent witness to the sheriff, to tell him to come to his house, in order that he might surrender himself." The court excluded this evidence, on objection by the State, and the defendant excepted. Mrs. Godfrey, a witness for defendant, who was a near neighbor, and went to his house immediately after the shooting, testified that "she found him crying over his wife, and said, 'What will I do?'" and she told him to live right and raise the children." After the evidence was closed, and the State had announced that a conviction would not be asked for a higher offense than manslaughter in the second degree, "the court, on motion of the State, excluded what defendant's dying wife said—that she wanted him to be with her children after her death; and the defendant excepted." The bill of exceptions purports to set out "substantially all the evidence material to the points raised," but says nothing about any "dying declarations," unless the reference is to the testimony of Mrs. Godfrey.

The court charged the jury in writing, and the defendant reserved exceptions to each of the following portions: (1.) "If defendant pointed the pistol at his child, believing it was not loaded, and snapped it, and it went off and killed his wife, he would be guilty· of manslaughter in the second degree." (2.) "If this [the shooting] was done while snapping the pistol at his child, it was unlawful." The exception to each of these portions of the charge was based, as the bill of exceptions states, on the ground that "it was abstract and not authorized by the evidence." Another portion of the general charge, as copied in the transcript, was in these words: "If, however, the jury find that the defendant snapped the pistol at his child, and afterwards poured some oil on it, and was holding it with one hand, while revolving the cylinder with the other, and it accidently fired, *and by accident Mrs. Johnson was in range, ond was shot and killed,* and [?] such killing was by misadventure, and the defendant· is not guilty." The defendant excepted to the italicized words in this portion of the charge, but the ground of the exception is not stated.

The defendant requested the following charges in writing, and duly excepted to their refusal: (1.) "Unless the jury find from all the testimony that the defendant intentionally pointed the pistol at his wife when he shot her, they must find

[Johnson v. The State.]

him not guilty." (2.) "Unless the jury believe from all the evidence that the defendant intentionally pointed the pistol at his wife, they can not find him guilty." (3.) "If the jury believe from the evidence that the defendant is shown to be a man of good character, that itself may generate a doubt, although none otherwise exists."

J. L BURNETT, for appellant.

WM. L. MARTIN, Attorney-General, for the State.

COLEMAN, J.—It is argued that the court at which the defendant was tried, was held at a time not authorized by law. The court began on the 2d Monday of July, 1891. The act fixing the time when the courts composing the 9th Judicial Circuit should be held declares as follows : (1.) In the county of Cherokee, on the second Monday in January and July, and at each term may continue three weeks. After fixing the time for each county, the act provides, "that this act shall not take effect until after the Spring terms of said courts are held for the year 1891."—Approved Feb. 14th, 1891. When this act was approved, the courts were then being held in the 9th Judicial Circuit, under the law in force as fixed by the Code; and by virtue of its provisions the last court held in this circuit began on the ninth Monday after the fourth Monday in January and July, and might continue for four weeks.—Code, § 749. The last court to be held in this circuit, under the law as fixed by the Code, and then in force, would expire in April, following the adoption of the act of Feb. 14th, 1891. It was the purpose of the legislature that these terms should not be interfered with, or affected by the new order or arrangements, and to accomplish this result it was provided that the later act should not take effect, until after those terms had been completed. We think there is nothing in this objection.

Under section 4449 of the Code, it is sufficient to serve a copy of the indictment and *venire* upon the defendant in person, or counsel appearing for him.—*Reese v. State*, 90 Ala. 626.

The name of Jno. A. Kennedy was drawn from the hat as a juror in the case. The record shows that Jno. A. Kennedy had been summoned as a regular juror for the week, but did not attend, and the regular jury had been impannelled without him. His name was on the *venire*, a copy of which had been served upon the defendant's counsel. The rule requires that, when the day fixed for the trial of one charged with a capital offense is a day of the week in which the order setting a day

for the trial is made, the copy served upon the defendant shall include the names of those in *attendance and impannelled* as regular jurors for the week, but, when the day fixed for the trial is a day of a week succeeding the week in which the order is made, the list of jurors to be served upon the defendant must include the names of the jurors summoned to serve as regular jurors for that week.—*Shelton v. State,* 73 Ala. 5; *Posey v. State, Ib.* 490; *Floyd v. State,* 55 Ala. 61. The juror Kennedy failing to answer, the court, against the objection of the defendant, ordered the drawing from the hat to proceed. The defendant at the trial assigned no grounds for the objection, and now insists that the court should have ordered another juror summoned to supply his place. The case is not covered by section 4322 of the Code, where this course is prescribed by statute. There was no mistake in the name of the juror, Jno. A. Kennedy. It was simply the case of a juror who had been summoned and failed to attend. The principle applying here was decided in *Hall v. State,* 51 Ala. 13. In the latter case, a juror failing to answer to his name when drawn, the court ordered another name to be drawn, and it was held to be without error. See, also *Johnson v. State,* 47 Ala. 34. The reasons for the rule are there stated.

There is nothing in the objection that the name W. F. Roberts appeared in the list served upon defendant's counsel, when the correct name was W. L. Roberts. It was the duty of the trial court to examine the original and copy, and determine whether the copy was correct. That was done in the present case. The record shows that the copy served contained the name of W. L. Roberts, and from an inspection of the original, sent up to this court, but which was unnecessary, our conclusion concides with the trial court.

When a person is charged with having unlawfully killed his wife, it is permissible to prove unlawful relations with another woman. It is evidence tending to show motive. It is not permissible for a defendant to make evidence for himself by showing that he offered to surrender to the sheriff, or refused to flee. On these propositions, see *Pate v. State, ante,* p. 14, and authorities cited.

It is not proper to ask one witness, if another witness, who had testified as to certain language used by the defendant, was not mistaken in his statement. The witness thus interrogated should give his recollection of the language used. It is the province of the jury to draw the conclusion in such cases.

We understand the remark of the court to which exception was reserved, as simply implying a doubt as to the correct-

ness of counsel's recollection, in the statement made as to the ruling of the Supreme Court. The court withdrew the remark, and we are unable to perceive how injury resulted to defendant.

No predicate was laid for the introduction of the statement by the deceased as a dying declaration, and it was not shown how long after the shooting before the declaration was made. Acts and declarations, to be admissible under the principle of *res gestæ*, must be substantially contemporaneous with the main fact under consideration, and so closely connected with it as to illustrate its character.—*Fonville v. State*, 91 Ala. 42. The declarations were not admissible for any purpose.

Our statute divides manslaughter into two degrees, as follows : "Manslaughter by voluntarily depriving a human being of life, is manslaughter in the first degree; and manslaughter committed under any other circumstance, is manslaughter in the second degree."—Code, § 3731. Involuntary manslaughter has been defined to be the unlawful killing of a human being, without malice, either expressed or implied, and without intent to kill or inflict the injury causing death, committed accidentally in the commission of some unlawful act not felonious, or in the improper or negligent performance of an act lawful in itself.—6 Amer. & Eng. Encyc., p. 588. If an act be done unlawful in itself, but without mischievous intention, and the act was done heedlessly and incautiously, it will be manslaughter, not accidental death, because the act which ensued was unlawful.—Roscoe's Cr. Ev. § 721. Misadventure, says Blackstone, happens in consequence of a lawful act; involuntary manslaughter, in consequence of an unlawful act. 2 Bl. Com. § 192. A whips an horse on which B is riding; whereupon the horse springs out, and runs over a child and kills it ; this is manslaughter in A, but misadventure in B. 1 East's P. C. 255. Manslaughter in the second degree is when the homicide results from the commission of a misdemeanor, or civil tort, but which result was not intended or contemplated.—*Mitchell v. State*, 60 Ala. 33.

By act of the legislature, the pointing of a gun or pistol or other fire-arm at another, whether loaded or unloaded, is made an offense.—Acts of 1888-9, p. 67. There is evidence, that of the witness Wilson, which tended to show that the defendant was snapping his pistol at a child when it went off and killed deceased. The charge of the court upon this phase of the evidence was neither abstract nor erroneous. It was not necessary that the defendant should have intentionally pointed the pistol at the deceased, to constitute the offense. If he intentionally pointed it at the child, and while doing this un-

[Moody v. The State.]

lawful act it went off and killed deceased, although he may have supposed it was not loaded, he was guilty at least of involuntary manslaughter. The killing was not a misadventure.

Good character may generate a doubt in cases where, without such proof, the jury would be satisfied beyond a reasonable doubt of the defendant's guilt. But the jury are not authorized to consider the proof of good character, independent of the other evidence in the case. It is taken into consideration with all the evidence, weighed with it, and if upon the whole evidence the jury entertain no reasonable doubt of guilt, they must convict. The manner of expression used in the charge requested, was calculated to convey to the jury that they might consider the proof of good character by itself, or independent of the other evidence, and when separately considered, it might generate a doubt. We have but recently condemned a somewhat similar charge in the case of *Pate v. State*, present term, and is liable to the same objection as the charge criticised in *Williams v. State*, 52 Ala. 412.

We have examined the exceptions to the general charge of the court and each assignment of error, and find no reversible error in the record. The judgment of the court, that the defendant perform hard labor for the county for a term of fifteen months, to pay the cost of the prosecution, was erroneous. Eight months is the limit in cases of misdemeanor, for which a person may be sentenced to pay cost. The judgment will be here corrected in this respect, and as thus corrected is affirmed.—*Bradley v. State*, 69 Ala. 318.

Affirmed.