# Arp v. The State.

*Indictment for Murder.*

1. *Motion to quash venire in capital case.*—That some of the jurors summoned on a special *venire* to try a capital case had served as re;ular jurors the preceding week; that another had been summoned as a regular juror the week of the trial, and another had served as juror at a term of the same court in the same year, are not sufficient reasons for quashing the *venire*.

2. *Impannelling jury.*—That one of the jurors summoned was, when called, engaged in the trial of another cause; that another had not been a resident of the State and county for one year; that another failed to answer when called; that another was over the age of seventy years, and was challenged by the State for cause; that another, after stating that he had formed an opinion about the case, but in his judgment it would not bias his verdict, was pronounced competent, constitutes no cause of challenge to the jury selected to try the cause.

3. *Killing innocent person under duress.*—Aside from the common law rule that compulsion does not justify taking the life of an innocent person, an instruction to the jury that the deliberate killing of an innocent person under threats of impending peril to the slayer's life, proceeding from other parties, such as to take away his free agency, is excusable, is properly refused when it ignores evidence of an opportunity for him to escape after being informed that he must perpetrate the homicide.

APPEAL from Cherokee Circuit Court.

Tried before Hon. JOHN B. TALLY.

Sherman Arp was jointly indicted with Alex. Burkalter and Green Leath for the murder of George Pogue. There being a severance, Sherman Arp was tried alone and con-

victed and sentenced to be hanged. He requested two charges to the jury, which were refused. The first is set forth in the opinion; the second is as follows: (2) "If the jury do not believe from the evidence, beyond all reasonable doubt, that the defendant killed deceased from a present impending necessity, or from belief of a present impending necessity, then he is not guilty of murder."

R. B. SMYER, for appellant, insisted that the facts showed that the defendant had no malice, citing *Mitchell v. State*, 60 Ala. 26; *Fields v. State*, 52 Ala. 348; 1 Bish. Cr. Law, p. 270; 1 Clark's Man., 210--212; 6 Am. & Eng. Ency. 64; *Ib.* 69.

W. L. MARTIN, Attorney-General, for the State.

COLEMAN, J.—At the July Term, 1892, of the Circuit Court, the defendant was convicted of murder in the first degree, and sentenced to suffer death.

The defendant moved to quash the *venire* summoned: 1st. Because some of the jurors summoned on the special *venire* had served as regular jurors during the preceding week. 2d. Because Wm. Jackson, who was summoned as a regular juror for the week, had not been a resident of the State or county for the preceding twelve months. 3d. Because one C. H. McCullough, whose name appears on the *venire* served as a regular juror at the January term 1892. These several motions were properly overruled.—Criminal Code, § 4301; *Fields v. State*, 52 Ala. 351; *Gibson v. State*, 89 Ala. 126.

The objections to the empannelling of the jury were as follows: 1st. That one of the jurors drawn failed to answer, it appearing that said juror was at that time serving as a juror on another case, and was out considering that case. The second objection is the same as the first. 3d. That one of the jurors drawn had not been a resident of the State or county for the past preceding twelve months, and was excused for cause. 4th. That one of the persons whose name was drawn, who had been summoned to serve as a juror, failed to answer when called. 5th. That one of the persons summoned as a juror was over the age of seventy, who was challenged by the State for cause. 6th. That one of the persons summoned, on his examination as to his competency, stated that he had heard a part of the evidence at a preliminary examination of the defendant, and from that evidence had formed an opinion as to the guilt or innocence

[Arp v. The State.]

of the defendant, but that in his judgment said opinion would not bias his verdict. Upon this statement the court pronounced the person competent to serve as a juror. Each of these objections have been adjudicated by this court, and declared to be without merit. See the following authorities: On the first and second propositions, *Johnson v. State*, 94 Ala. 40, and authorities cited; on the third proposition, *Field's Case*, 52 Ala. *supra*, and *Gibson's Case*, 89 Ala. *supra*; on the fourth, *Johnson v. State, supra;* on the 5th, Criminal Code, § 4331, sub-div. 8; on the 6th, *Hammill v. State*, 90 Ala. 577. Neither of the objections come within the principle decided in the case of *McQueen v. State*, 94 Ala. 52, or of *Darby v. State*, 92 Ala. 9.

The confessions of the defendant were voluntarily made and were properly admitted. Moreover, the defendant himself, who testified in his own behalf, did not deny they were voluntarily made, but himself testified substantially as true the main fact given in evidence as confessions. The testimony of the defendant and the evidence admitted as confessions, showed that he took the life of the deceased without provocation on the part of the deceased, and when there was no real or apparent necessity for the act so far as such necessity proceeded from the deceased. According to his own statement, the object to be accomplished by taking the life of the deceased was to prevent deceased from appearing as a witness against him, and one Burkhalter and Leith, charged with retailing whiskey without a license. The defendant's excuse for the homicide was that Burkhalter and Leith threatened to take his life unless he killed deceased; that they were present, armed with double-barrelled shot guns, and threatened to kill him unless he killed deceased, and that it was through fear and to save his own life he struck deceased with an axe. He admits that after having struck deceased down he rifled the pockets and took what money was found in the pockets of the deceased.

On this phase of the evidence the court was asked to give the following charge: "If the jury believe from the evidence that the defendant killed Pogue under duress, under compulsion from a necessity, under threats of immediate impending peril to his own life, such as to take away the free agency of the defendant, then he is not guilty." The court refused this charge, and the refusal is assigned as error. This brings up for consideration the question, what is the law when one person, under compulsion or fear of great bodily harm to himself, takes the life of an innocent person; and what is his duty when placed under such circumstances?

[Arp v. The State.]

The fact that defendant had been in the employment of Burkhalter is no excuse. The command of a superior to an inferior, of a parent to a child, of a master to a servant, or of a principal to his agent, will not justify a criminal act done in pursuance of such command.—1 Bishop, § 355; *Reese v. State*, 73 Ala. 18; 4 Blackstone, § 27.

In a learned discussion of the question, to be found in Leading Criminal Cases, Vol. 1, p. 81 and note on p. 85, by Bennett & Heard, it is declared that "for certain crimes the wife is responsible, although committed under the compulsion of her husband. Such are murder," &c. To the same effect is the text in 14 Am. & Eng. Encyc. of Law, p. 649; and this court gave sanction to this rule in *Bibb v. State*, 94 Ala. 31; 10 So. Rep. 506. In Ohio a contrary rule prevails in regard to the wife.—*Davis v. State*, 15 Ohio, 72; 45 Amer. Dec. 559. In Arkansas there is a statute specially exempting married women from liability, when "acting under the threats, commands or coercion of their husbands," but it was held under this act there was no presumption in favor of the wife accused of murder, and that it was incumbent on her to show that the crime was done under the influence of such coercion, threats or commands."—*Edwards v. State*, 27 Ark. 493, reported in 1 Criminal Law by Green, p. 741.

In the case of *Beal v. The State of Ga.*, 72 Ga. Rep. 200, and also in the case of *The People v. Miller*, 66 Cal. 468, the question arose upon the sufficiency of the testimony of a witness to authorize a conviction for a felony, it being contended that the witness was an accomplice. In both cases the witness was under fourteen years of age. It was held that if the witness acted under threats and compulsion, he was not an accomplice. The defendants were convicted in both cases.

In the case of *Rex v. Crutchly*, 5 C. & P. 133, the defendant was indicted for breaking a threshing machine. The defendant was allowed to prove that he was compelled by a mob to go with them and compelled to hammer the threshing machine, and was also permitted to prove that he ran away at the first opportunity.

In Hawkins' Pleas of the Crown, Vol. 1, Ch. 28, Sec. 26, it is said: "The killing of an innocent person in defense of a man's self is said to be justifiable in some special cases, as if two be shipwrecked together, and one of them get upon a plank to save himself, and the other also, having no other means to save his life, get upon the same plank, and finding it not able to support them both, thrusts the other

Vol. 97.

[Arp v. The State.]

from it, whereby he is drowned, it seems that he who thus preserved his own life at the expense of that other, may justify the fact by the inevitable necessity of the case."

In 1 Hale's Pleas of the Crown, Ch. VIII, § 50, it is said "There is to be observed a difference between the times of war, or public insurrection or rebellion, when a person is under so great a power, that he can not resist or avoid, the law in some cases allows an impunity for parties compelled, or drawn by fear of death to do some acts in themselves capital, which admit no excuse in time of peace.    .    .    . Now as to times of peace, if a man be menaced with death, unless he will commit an act of treason, murder or robbery, the fear of death doth not excuse him, if he commit the act; for the law hath provided a sufficient remedy against such fears by applying himself to the court and officers of justice for a writ or precept *de securitate pacis*. Again, if a man be desperately assaulted, and in peril of death, and can not otherwise escape, unless to satisfy his assailant's fury he will kill an innocent person, the present fear of actual force will not acquit him of the crime and punishment of murder, if he commit the act; for he ought rather to die himself than kill an innocent; but if he can not otherwise save his own life, the law permits him in his own defense to kill his assailant."

Blackstone, Vol. 4, § 30, declares the law to be, "Though a man be violently assaulted, and has not other possible means of escaping death, but by killing an innocent person; this fear and force shall not acquit him of murder; for he ought rather to die himself, than escape by the murder of an innocent."

In Stephen's Commentaries, Vol. 4, Book 6, Ch. 2 pp. 83–4 the same rule is declared to be the law.

In East's Crown Law, the same general principles are declared as to cases of treason and rebellion, &c. But on page 294, after referring to the case of two persons being shipwrecked and getting on the same plank, proceeds as follows: "Yet, according to Lord Hale, a man can not even excuse the killing of another who is innocent, under a threat, however urgent, of losing his own life unless he comply. But if the commission of treason may be extenuated by the fear of present death, and while the party is under actual compulsion, there seems no reason why this offense may not be mitigated upon the like consideration of human infirmity. But if the party might, as Lord Hale, in one place, supposes, have recourse to the law for his protection against such threats, it will certainly be no excuse for committing murder."

In Russell on Crimes, Vol. 1, § 699, it is stated as follows: "The person committing the crime must be a free agent, and not subject to actual force at the time the act is done; thus, if A by force take the arm of B, in which is a weapon and therewith kill C, A is guilty of murder, but not B. But if it be only a moral force put upon B, as by threatening him with duress or imprisonment or even by an assault to the peril of his life in order to compel him to kill C, it is no legal excuse."

In the case of *Regina v. Tyler*, reported in 8 Car. & Payne 618, Lord Denham, C. J. declares the law as follows: "With regard to the argument, you have heard, that these prisoners were induced to join Thom, and to continue with him from a fear of personal violence to themselves, I am bound to tell you, that where parties, for such reason, are induced to join a mischievous man, it is not their fear of violence to themselves which can excuese their conduct to others.  ·   ·   ·   ·   The law is that no man, from a fear of consequences to himself, has a right to make himself a party committing mischief on mankind."

In the case of *Respublicae v. McCarty*, 2 Dallas 86, when the defendant was on trial for high treason, the court uses this language: "It must be remembered that, in the eye of the law, nothing will excuse the act of joining the enemy but the fear of immediate death; not the fear of any inferior personal injury, nor the apprehension of any outrage on property."

The same rule in regard to persons charged with treason as that stated in Hale's Pleas of the Crown is declared in Hawkins, Vol. 1, Ch. 17, Sec. 28 and note, and both authors hold, that "the question of the practicability of escape is to be considered, and that if the person thus acting under compulsion continued in the tieasonable acts longer than was necessary, the defense '*pro timore mortis*' will not be available."

This principle finds further support in the case of *U. S. v. Greiner*, tried for treason, reported in 4 Phil. 396, in the following language : "The only force which excuses on the grounds of compulsion is force upon the person and present fear of death, which force and fear must continue during all the time of military service, and that it is incumbent in such a case upon him who makes force his defense to show an actual force, and that he quitted the service as soon as he could."

Wharton's Criminal Law, Vol. 1, § 94, under the head of Persons under Compulsion, says "Compulsion may be viewed in two aspects: 1. When the immediate agent is phys-

ically forced to do the injury, as when his hand is seized by a person of superior strength, and is used against his will to strike a blow, in which case no guilt attaches·to the person so coerced. 2. When the force applied is that of authority or fear. Thus, when a person not intendin gwrong, is swept along by a party of persons whom he cannot resist, he is not responsible, if he is compelled to do wrong by threats on the part of the offenders instantly to kill him, or to do him grievous bodily harm, if he refuses; but threats of future injury, or the command of any one not the husband of the offender, do not excuse any offense. Thus, it is a defense to an indictment for treason, that the defendant was acting in obedience to a *de facto* government, or to such concurring and overbearing sense of the community in which he resided as to imperil his life in case of dissent." In section 1803a of the same author (Wharton), it is said: "No matter what may be the shape compulsion takes, if it affects the person and he yielded to it *bona fide*, it is a legitimate defense."

We have examined the cases cited by Mr. Wharton to sustain the text, and find them to be cases of treason, or fear from the party slain, and in none of them is there a rule different from that declared in the common law authorities cited by us.

Bishop on Criminal Law, §§ 346, 347, 348, treats of the rules of law applicable·to acts done under necessity and compulsion. It is here declared: "That always an act done from compulsion and necessity is not a crime. To this proposition the law knows no exception. Whatever it is necessary for a man to do to save his life, is, in general, to be considered as compelled."

The cases cited to these propositions show the facts to be different from those under consideration. The case referred in I Plow. 19, was where the defendant had thrown overboard a part of his cargo of green wood, during a severe tempest, to save his vessel and the remainder of his cargo. The other 5 Q. B. 279, was for the failure to keep up a highway, which the encroachments of the sea had made impossible; and that of *Tate v. The State*,·5 Black. 73, was also that of a supervisor of a public highway, and the others were cases of treason, to which reference has been made. In section 348, the author cites the rule laid down by Russell, and also of Lord Denman, and in 1 East P. C., to which reference has already been made. In section 845, the same author uses the following language: "The cases in which a man is clearly justified in taking another's life to save his own are when the

[Arp v. The State.]

other has voluntary placed himself in the wrong. And *probably*, as we have seen, it is never the right of one to deprive an innocent third person of life for the preservation of his own. There are, it *would seem*, circumstances in which one is bound even to die for another." Italics are ours— emphasized to call attention to the fact, that the author is careful to content himself more with a reference to the authorities, which declare these principles of law than an adoption of them as his own.

The authorities seem to be conclusive that, at common law, no man can excuse himself, under the plea of necessity or compulsion for taking the life of an innocent person.

Our statute has divided murder into two degrees, and affixed the punishment for each degree, but in no respect has added to or taken away any of the ingredients of murder as known at common law.—*Mitchell v. State*, 60 Ala. 26 ; *Fields v. State*, 52 Ala. 352.

That persons have exposed themselves to imminent peril and death for their fellow man, and that there are instances, where innocent persons have submitted to murderous assaults and death rather than take life is well established, but such self sacrifices emanated from other motives than the fear of legal punishment. That the fear of punishment by imprisonment or death at some future day by due process of law can operate with greater force to restrain or deter from its violation, than the fear of immediate death, unlawfully inflicted, is hardly reconcilable with our knowledge and experience with that class of mankind, who are controlled by no other higher principle than fear of the law. Be this as it may, there are other principles of law undoubtedly applicable to the facts of this case, and which we think can not be ignored.

The evidence of the defendant himself shows that he went to Burkhalter's house about nine o'clock of the night of the killing, and there met Burkhalter and Leith, and that it was there, and at that time, they told him he must kill Pogue. The evidence is not clear as to how far it was from Burkhalter's to Pogue's dwelling, where the crime was perpetrated ; but it was sufficient to show that there was some considerable distance between the places, and he testifies as they went to Pogue's, they went by the mill and got the axe, with which he killed him. Under every principle of law, it was the duty of the defendant to have escaped from Burkhalter and Leith, after being informed of their intention to compel him to take the life of Pogue, as much so as it is the duty of one who had been compelled to take up

arms against his own government, if he can do so with rea-
sonable safety, to himself; or of one assailed to retreat, be-
fore taking the life of his assailant. Although it may have
been true, that at the time he struck the fatal blow, that he
had reason to believe he would be killed by Burkhalter and
Leith, unless he killed Pogue, yet, if he had the opportu-
nity, if it was practicable, after being informed at Burk-
halter's house of their intention, he could have made his
escape from them with reasonable safety, and he failed to
do so, but remained with them until the time of the killing,
the immediate necessity or compulsion under which he
acted at that time would be no excuse to him. As to
whether escape was practicable to defendant, as we have
stated, was a question of fact for the jury. The charge,
numbered 1 and refused by the court, ignored this principle
of law and phase of evidence, and demanded an acquittal of
defendant, if at the time of the killing the compulsion and
coercion operated upon the defendant, and forced him to
the commission of the act, notwithstanding he might have
avoided the necessity by escape before that time. We do
not hesitate to say he would have been justifiable in taking
the life of Burkhalter and Leith, if there had been no other
way open to enable him to avoid the necessity of taking the
life of an innocent man. The charge requested was erron-
eous and misleading, in the respect that it ignored the law
and evidence in these respects.

The second charge requested was properly refused. We
suppose the principle asserted is exactly the contrary of
that intended. By the use and position of the negatives
the charge is made to assert that unless there was a present
impending necessity to strike, there could be no murder.

There is no error in the record.

It appearing that the day appointed for the execution of
the sentence has passed, it is considered and ordered that
Friday, the 10th day of March next (1893), be and is hereby
appointed and specified for the execution of the sentence of
the law pronounced by the trial court, and the sheriff or his
deputy, or the officer acting in his place, must execute the
sentence.

Affirmed.