## STATE vs. SARKIS NARGASHIAN.

### PROVIDENCE—JULY 20, 1904.

PRESENT: Stiness, C. J., Tillinghast and Douglas, JJ.

(1)  *Criminal Law.   Murder.   Aiding and Abetting Crime.*

Upon an indictment for murder defendant requested court to charge that, if the jury believed deceased was dead before defendant took hold of his hands (in compliance, as he alleged, with the request of his accomplice to hold deceased's hands while accomplice did the killing), defendant should be acquitted:—

*Held,* properly refused; since, if defendant was present as an aider and abettor in the crime, he would be a principal, although the other did the killing.

(2)  *Criminal Law.   Murder.   Justification of Killing by Reason of Fear of Death.*

Upon an indictment for murder defendant requested court to charge that, if defendant assisted in the killing but did so under fear of instant death at the hands of his accomplice, he should be acquitted:—

*Held,* properly refused; since request took no account of any opportunity afforded defendant to escape, or to successfully defend himself, or of the reasonableness of the fear.

The mere fear of death at the hands of another is not an excuse for taking the life of an innocent person; but to justify such act there must be a reasonable fear exercising such an irresistible force upon the mind as to show that accused was without the power to form a premeditated intent, taken in connection with the time between the threat and the killing and the opportunity of escape open to accused.

(3) *Criminal Law.   Murder.   Justification of Killing by Reason of Fear of Death.*

The intentional killing of another, under threats from a third party, without sufficient excuse on the ground of fear, is murder, not manslaughter.

INDICTMENT charging murder.   Heard on petition of defendant for new trial, and denied.

STINESS, C. J.   This indictment charged Sarkis Nargashian and Kasper Nigohian with the murder of Peter Ouloosian. Nigohian having absconded, Nargashian was tried alone and convicted.   He now petitions for a new trial upon exceptions to alleged errors in charging and refusing to charge, and also upon the ground that the verdict was against the evidence.

The testimony of the defendant shows that he and Nigohian conspired to get the deceased drunk in a saloon, so that he would be unable to meet a girl at a barn as appointed, Nargashian thus to meet the girl in his place.   Nigohian took Ouloosian to the barn, Nargashian going there alone, and when the latter went in he found Ouloosian lying on the floor.   He says that Nigohian, older and stronger than himself, said to him:   "You must help me, so I can kill Peter; if you don't, I will kill you."   Nigohian had an axe in his hand.   The petitioner testifies:   "He told me, 'you must hold his hands,' and I did, and afterwards he says, 'you grab his throat so I will get the money out of him.'"   He then says that he did this because he was frightened; that Nigohian took the money from Ouloosian, over $600, and put it in the petitioner's pocket, and after they went out it was divided equally, the defendant taking it still under threats.   The defendant further testified that he did not help kill Ouloosian, because he was dead when he took hold of his hands.

The autopsy by the medical examiner showed that death had been caused by strangulation, and that there were twenty distinct marks of finger-nails on the throat of the deceased.

(1)     The defendant asked the court to charge:   "If the jury believe that Ouloosian was dead before the defendant took hold of his hands in the barn, then they are to find the defend-

ant not guilty." The request was refused, and exception taken.

We think the refusal of the request was correct. Assuming that the killing was done by Nigohian, there is still ample testimony from which the jury could find that Nargashian was present at the time of the homicide, aiding and assisting in it, even though Ouloosian may have been dead when the defendant took hold of his hands. If he were present as an aider and abettor in the crime he would be a principal, although the other did the killing. Bouv. Law Dict., "Aiding and Abetting." The request was too broad in its terms to allow the consideration of these facts, and it was therefore rightly refused.

The second and third requests to charge were: "If the jury believe that the defendant assisted in the killing of Ouloosian, but did so under fear of instant death at the hands of Nigohian, then they are to find the defendant not guilty."

(2)    "If the jury believe the testimony of the defendant, then they are to find him not guilty."

The question raised by the defendant under these requests is that of threat and fear of his own death as a defence.

The proposition involved in these requests is a very narrow one, which takes no account of opportunity to escape; to successfully defend himself; the reasonableness of the fear; or other matters which may properly be taken into account. The defendant assumes, from the language used in some cases, that the mere statement of a fear of death is sufficient as a defence.

In the case of Stratton, 21 St. Trials, 1046-1223, Lord Mansfield said: "Wherever necessity forces a man to do an illegal act, *forces* him to do it, it justifies him, because no man can be guilty of a crime without the will and intention of his mind. A man who is absolutely, by natural necessity, forced, his will does not go along with the act; and therefore in the case of natural necessity, if a man is forced to commit acts of high treason, if it appears really force, and such as human nature could not be expected to resist, and the jury are of that opinion, the man is not then guilty of high treason."

The conditions here laid down fall far short of the bald statement of the requests.

The defendant argues that if duress is a defence in treason, it should also apply in murder. There are differences, however, in the two high crimes which may well be taken account of. Treason is usually a continuing act from which there is a possibility of escape; and in *Respublica* v. *McCarty*, 2 Dall. 86, a suggestion of escape is made as though it might nullify the intent. The mere fear of death, therefore, may well be allowed when a loyal intent may be shown by a possible speedy return to allegiance. But murder is a consummated act, irreparable after commission, and hence to be guarded against by a stricter rule, and such a rule has been applied in cases of murder.

Blackstone says, in 4th Com. *30: "In time of war or rebellion, a man may be justified in doing many treasonable acts, by compulsion of the enemy or rebels, which would admit of no excuse in time of peace. This, however, seems only, or at least principally, to hold as to positive crimes, so created by the laws of society, and which, therefore, society may excuse; but not as to natural offences so declared by the law of God, wherein human magistrates are only the executioners of divine punishment. And therefore, though a man be violently assaulted, and hath no other possible means of escaping death but by killing an innocent person, this fear and force shall not acquit him of murder; for he ought rather to die himself, than escape by the murder of an innocent. But, in such a case, he is permitted to kill the assailant; for there the law of nature and self-defence, its primary canon, have made him his own protector."

In *U. S.* v. *Haskell*, 4 Wash. (U. S. Cir. Ct.) 402, Washington, J., laid down the rule that the jury must find "*a well grounded* cause to fear that *death* might be the consequence of their refusal to submit to Smith as the commander of the vessel. If they had not, they can not excuse themselves in point of law by the allegation that they acted under the impulse of fear."

In *People* v. *Repke*, 103 Mich. 459, a threat, made three days before a murder, that the respondent would himself be killed, if he did not go and assist, was held to be no defence.

In *Leach* v. *State*, 99 Tenn. 584, a request to charge that if the defendant was forced, by fear of co-conspirators, to commit the murder, in order to save his own life, he would not be guilty of murder, was held to be properly refused. The court said: "He could not, with any degree of legal palliation, elect a course, absolutely safe to himself, and slay an innocent man, rather than take some risk to himself in an equal combat with a relentless companion."

In *State* v. *Fisher*, 23 Mont. 540, where one had threatened to take the life of the defendant if he refused to kill another, who was a mile away, and the defendant, believing that the threat would be executed, to save his own life, killed the man as directed, it was held to be deliberate murder.

In *Rizzolo* v. *Commonwealth*, 126 Pa. 54, instructions were sustained to the effect that while a man may take the life of his assailant for the purpose of preventing the infliction of grievous bodily harm upon himself, or for the purpose of preserving his own life, there is no principle of law which would justify or excuse him in taking the life of an innocent person to protect himself; also, that if he was coerced by fear of another, the jury should inquire whether his explanation is such as would show that he had not the power to form the willful, deliberate, and premeditated intent to take the life of the victim.

The foregoing cases, all of which are cited by the defendant, sufficiently show that the requests were properly refused. They embraced no limitations such as appeared in the two cases most favorable to him. In *U. S.* v. *Haskell*, a *well-grounded* fear was required to be shown, and in *People* v. *Repke*, the time between the threat and the killing was a controlling factor. The other cases cited are opposed to the defence of fear which is here set up.

In *Baxter* v. *People*, 8 Ill. 368, the court held that a subsequent aiding and abetting in robbery of the deceased, after the danger had passed away, made the defendant as guilty as if such danger had never threatened him.

It would be a most dangerous rule if a defendant could

shield himself from crime by merely setting up a fear from the threat of a third person.

In *Regina* v. *Tyler,* 8 C. & P. 616, Lord Denman said that fear "has never been received by the law as an excuse for his crime, and the law is that no man, from fear of consequences to himself has a right to make himself a party to committing mischief on mankind." See also *Queen* v. *Dudley,* 14 Q. B. D. 273.

The refusal of a request substantially like those before us, but describing a fear to the extent of taking away one's free agency, was sustained in *Arp* v. *State,* 97 Ala. 5, upon a full review of authorities and reasons under the common law, because it ignored evidence of an opportunity to escape.

We think that the second and third requests were rightly refused.

(3) The seventh request was: "If the jury believe that the defendant assisted in killing Ouloosian, but under threats against the defendant by Kasper, as shown by the evidence, then they are to find the defendant guilty of manslaughter." This request was refused.

We have already seen that the intentional killing of another, under threats, is held to be murder. The only ground upon which the request is urged—indeed, the only upon which it can be urged—is that fear, like passion, may so cloud the mind as to eliminate malice. The comparison of the two elements of action is not apt. One's own passion is not a defence to reduce a crime unless it is caused by provocation, like a fight or a gross indignity, between the victim and the assailant. Passion induced by a third person would be no defence to a homicide. So fear induced by one person is no defence to a defendant who kills another under its influence. This, of course, is a general rule, but it applies to this case. There might be cases, like a panic, where a general fear might not only reduce, but even excuse, an unlawful act, but such is not this case. If one has sufficient power of mental action to put his own chances of safety against the life of an innocent third person, his act can neither be entitled to excuse nor reduction on the ground of

fear. Something more, at least, must appear than is shown in this request or in this case.

Upon a charge involving imprisonment for life we would not criticise too closely the terms of a request to charge, if a substantial defence appeared to which it might apply. The only ground of defence in this case is duress by reason of fear. Apart from its legal sufficiency, it appears to have no support in fact, and the facts are involved in the petition for a new trial on the ground that the verdict was against the evidence. A few of the salient facts show clearly that the defendant was not actuated solely by fear.

By his own statement he assisted in getting the deceased drunk. He followed when Nigohian took him to the barn agreed upon. He went into the barn voluntarily. He stated that Nigohian demanded that he should "help kill Peter;" thus showing that he did not then believe that he was dead. After entering the barn he had ample opportunity to escape, when Nigohian had hold of Peter and had no axe in his hands. He made no outcry, though dwelling-houses were near. The deceased was choked to death, and he admits that he assisted in the choking, but claims that Ouloosian was dead before he did it. Twenty finger-nail prints were found on Ouloosian's throat, all of which, the doctors say, must have been made before death. The defendant said it took about twenty minutes before Peter was "out." He held the deceased by the throat while Nigohian cut off the money-belt and took from Ouloosian $620 in money. He did not leave the body until Kasper told him that Peter was "out;" a fact showing still further that he did not consider he was dead before. He took one-half of the money, $310, and, although he says that Nigohian put it into his pocket without his knowledge, he kept it after he knew he had it, and while he was with Nigohian. After the murder he went with Nigohian to a saloon and drank with him, and then went home to bed. He gave no information to police authorities or others, after he separated from Nigohian, until he was arrested. The defendant on the way from the barn threw the axe which Nigohian had into the river. In addition to all this the defendant made a full confession, in

the presence of several witnesses, after he was arrested. He was a second-hand at the Rhode Island Locomotive Works, in charge of 100 men, and not likely to be easily intimidated.

In view of these facts, and others which we need not refer to, the verdict was not against the evidence; nor does the case show any foundation for a defence by reason of fear, even if it could have availed.

Petition for a new trial denied.

*Charles F. Stearns, Attorney-General,* for State.
*William A. Morgan and Ratcliffe G. E. Hicks,* for defendant.