**Grant Leport TULLY, and, Molly Rose Kjelden, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–82–671.**

Court of Criminal Appeals of Oklahoma.

Dec. 30, 1986.

Christopher C. Szlichta, Szlichta & Morgan, Stillwater, for appellant, Grant Leport Tully.

Robert M. Murphy, Jr., Murphy & Murphy, P.C., Stillwater, for appellant, Molly Rose Kjelden.

Michael C. Turpen, Atty. Gen., William H. Luker, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Presiding Judge:

The appellant, Grant Leport Tully, was convicted for the offenses of Murder in the First Degree and Burglary in the Second Degree, in the District Court of Payne County, Case Nos. CRF–81–244 and CRF–81–247. The jury returned a verdict of guilty and set punishment at life imprisonment for the murder conviction and seven (7) years' imprisonment for the burglary. In the same trial, appellant, Molly Rose Kjelden was convicted as an Accessory After the Fact to Murder, and also was convicted of Burglary in the Second Degree. She was convicted to five (5) and seven (7) years' imprisonment respectively. These cases have been consolidated for appeal. We reverse each conviction, and remand for a new trial.

The essential facts of this case are undisputed by the litigants. On the evening of July 10, 1981, Jackie Frick was accosted by James Douglas Davis outside the Blue Room Bar in Stillwater, Oklahoma. Davis beat Frick senseless with an aluminum baseball bat and, along with Tully, took his money.[1] Tully and Davis escaped in a car driven by appellant Kjelden. After leaving the bar, the trio drove to Frick's trailer home. Davis and Tully broke into the home and stole numerous items. The three were arrested early the next morning at the home of Thomas Graham and Mike Kjelden. The evidence also revealed that Frick died around midnight the evening of the assault.

The State's theory was that Davis, Tully and Kjelden conspired to rob Mr. Frick, and that Frick's death arose from the commission of the planned robbery. It also was maintained, primarily through Davis' testimony, that Tully and Kjelden voluntarily entered into the robbery scheme.

The defense disputed this theory, and raised a claim of duress. Tully and Kjelden both asserted they knew nothing about any planned robbery, and were forced by Davis to enter into their criminal activities that evening.

During defense testimony, Tully and Kjelden admitted accompanying Davis to the Blue Room that evening. Kjelden testified they remained there for a time, but that Davis asked her to leave with him, in order that he might pick up some money at his employer's residence. Following this errand, Davis and Kjelden returned to the Blue Room, where Kjelden saw Frick, whom she had known for some time, pulling into the parking lot behind them. Kjelden waved at Frick and approached him. Davis went into the bar. Davis summoned

1. Davis was tried and convicted in a separate proceeding.

Tully from the bar, and Tully followed him out the backdoor. As he came outside, Tully saw Davis approach Frick, and strike Frick in the head with a baseball bat. As Davis continued to hit Frick, Kjelden jumped in the car and began honking the horn and flashing the headlights in an effort to make Davis stop the assault. However, Davis went to the car and told Kjelden to stop flashing the lights, or he would "ring her chimes." Davis returned to Frick, and struck him several more times with the bat. He then poked the bat into Tully's face, and ordered him to search Frick's pockets for money. Tully testified Davis threatened to kill him if he did not cooperate. Tully retrieved $14.00 from Frick's wallet. As the men fled the scene with Kjelden, Davis made threatening comments to a bystander.

Once in the car and away from the scene, Davis ordered Kjelden to drive to Frick's mobile home. When they arrived, Davis, with baseball bat still in hand, ordered Tully to "get your ass out of the car," and to assist in the burglary of Frick's residence.

Witnesses who saw Tully at the time of the assault, and those defense witnesses who saw him that evening at the Graham apartment, testified that he appeared to be nervous and terrified. Witnesses familiar with Davis confirmed Davis' propensity for violence. They also reported that Davis surrounded himself with weapons, normally the baseball bat, and had assaulted various people, including a pregnant woman and a teenage boy. Kjelden's psychological profile revealed her to be easily dominated by Davis. In fact, a psychologist testified that their relationship was "scary." Both Tully and Kjelden claimed they participated in the crime out of fear for their lives. The first degree murder charge against Tully was based on a felony-murder theory, with the predicate felony being robbery with a dangerous weapon. *See* 21 O.S. 1981, § 701.7(B).

Reversal in this case is necessitated by the trial court's refusal to deliver the appellants' joint requested instructions on the defense of duress. The State has raised three theories in support of its claim that the requested instructions were properly disallowed. First, regarding the charge of first degree murder against appellant Tully, the State claims that the duress defense is always unavailable for that degree of homicide. Second, again concerning the murder charge, the State claims the underlying robbery was completed by the time Tully joined in the fray and, therefore, the defense was unavailable. Third, insufficient evidence was presented to support the defense as it applied to this case, according to the State's argument.

■ Turning to the State's first claim, we observe that our Oklahoma statutes do not foreclose the availability of this defense to the crime of first degree murder, as do the statutes of various other jurisdictions.[2] Furthermore, we have never removed first degree murder as a class of crime in which this defense is exclusively prohibited,[3] as

---

**2.** For those that by statute exclude duress as a defense to certain serious offenses, *See* Ariz.Rev.Stat.Ann. § 13–412 (1978) (homicide or serious physical injury); Colo.Rev.Stat. § 18–1–708 (1978) (murder in the first degree); Ga.Code Ann. § 16–3–26 (West 1984) (murder); Ind.Code Ann. § 35–41–3–8 (West 1978); Iowa Code Ann. § 704.10 (West 1979) (intentional or reckless act causing physical injury); Kan.Stat. § 21–3209 (1974) (murder or voluntary manslaughter); Ky.Rev.Stat. § 501.090 (1975) (intentional homicide); La.Rev.Stat.Ann. § 14:18(6) (West 1974) (murder); Me.Rev.Stat. tit. 17–A § 54 (1980) (intentional or knowing homicide); Mo.Ann. Stat. § 562.071 (Vernon 1979) (murder); Or. Rev.Stat. § 161.270 (1979) (murder); Wash.Rev. Code Ann. § 9A.16.060 (1977) (murder or manslaughter).

Some states disallow the defense to any crime punishable by death. *See* Cal.Pen.Code § 26(7) (West Supp.1980); Idaho Code § 18–201(4) (1979); Ill.Ann.Stat. ch. 38, § 7–11 (Smith-Hurd 1972); Mont.Crim.Code § 94–3–110 (1977); Nev.Rev.Stat.Stat. § 194.010(8) (1979).

**3.** The State relies upon our decision in *Methvin v. State,* 60 Okl.Cr. 1, 60 P.2d 1062 (1936). We first note that *Methvin* is distinguishable from the instant case. The defendant in *Methvin* was charged with first degree murder, in that he aided, assisted or abetted Clyde Barrow and Bonnie Parker in the *premeditated* death of Cal Campbell. The appellant herein was charged with felony-murder. Further, the defendant in *Methvin* claimed he actually was asleep in the backseat of a car at the time the crime was

the Attorney General suggests. Accordingly, our interpretation of the duress statutes, as they apply to this issue, is one of first impression. In considering the application of the duress statutes in this context, we are guided by the common law at the time the statute was passed; for the common law, although not defining crime in Oklahoma,[4] furnishes "one of the most reliable backgrounds upon which analysis of the objects and purposes of a statute can be determined." 2A C. Sands, *Sutherland's Statutory Construction*, 50.01, p. 268 (3d ed. 1973). *See also Traxler v. State*, 96 Okl.Cr. 231, 251 P.2d 815, 829 (1952).

The defense of duress is defined by three of our Oklahoma statutes:

All persons are capable of committing crimes, except those belonging to the following classes:

\* \* \* \* \* \*

7. Persons who committed the act, or made the omission charged, while under involuntary subjection to the power of superiors.

\* \* \* \* \* \*

The involuntary subjection to the power of a superior which exonerates a person charged with a criminal act or omission from punishment therefore, arises from duress.

\* \* \* \* \* \*

The duress which excuses a person from punishment who has committed a prohibited act or omission must be an actual compulsion by use of force or fear.

21 O.S.1981, § 152(7), 155, 156. This series of statutes has been amended just once since its original passage in 1910, and that was to remove "coverture" as a defense under section 155.

The common law policy underlying duress as a defense to crime was based on society's realization that a person, when faced with the choice of two evils, should not be punished for accomplishing the lesser evil, and thereby avoiding the crime of greater magnitude. LaFave and Scott have explained that

One who, under the pressure of an unlawful threat from another human being to harm him (or to harm a third person), commits what would otherwise be a crime may, under some circumstances, be justified in doing what he did and thus not be guilty of the crime in question.... The rationale of the defense is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question. Rather it is that, even though he has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided harm of greater magnitude.

LaFave & Scott, *Criminal Law*, 374 (1973).

This "choice of evils" approach has been well described by a prominent authority on the English Common Law as an approach which one must "in order to escape that he dislikes most ... do something he dislikes less, though he may dislike extremely what he determines to do." 2 J. Stephens, *A History of the Criminal Law of England* at 102 (1883). *Accord* Williams, *Criminal Law: The General Part*, ch. 18 (2d Ed. 1972). A noted American scholar agrees, noting the general principle that, "where one of the harms is unavoidable, it is right to choose the lesser one" furnishes the basis for the American common law rule. J. Hall, *General Principles of Criminal Law* at 422 (2d Ed.1947).

---

committed, and first awoke when he heard gunfire. After he left the car, there was no shooting. 60 P.2d at 1065. He had no idea Barrow would attempt to shoot anyone. *Id.* Although Methvin claimed his actions *after* the crime were prompted by fear of Barrow, his testimony concerning the crime itself did not show duress.

Accordingly, the duress defense was simply not available, and any language in the opinion regarding duress as it relates to the offense of murder was mere *dicta*.

4. *See* 21 O.S.1981, § 2.

Accordingly, common law recognized early on that duress should have no application to the *intentional* taking of an innocent life by the threatened person. *See Arp v. State*, 97 Ala. 5, 12 So. 301 (1893). *See also State v. Nargashian*, 26 R.I. 299, 58 A. 953 (1904). The rationale for denial of this defense to intentional killing is premised on the theory that one should risk or sacrifice one's own life rather than take the life of an innocent person. *State v. Dissicini*, 126 N.J.Super. 565, 571, 316 A.2d 12, 16 (App.Div.1974) *aff'd* 66 N.J. 411, 336 A.2d 618 (1975) (en banc). The rationale also is in full accord with the "choice of evils" theory, for when the harm contemplated by the defendant is greater than, or equal to, the threatened harm, "he ought rather to die himself than escape by the murder of an innocent." 4 *Blackstone's Commentaries* 30, *See also* 1 Hale P.C. 51. Furthermore, since the possibility remains that the threat constituting duress will not be carried out, and when the contemplated and threatened harm are equally severe, one must take the risk and refuse to kill an innocent third party.

We believe this limitation to the duress defense is restricted to crimes of intentional killing, and not to felony-murder. It is compatible with the common law policy of duress that the defense should attach where the defendant consented, by duress, only to the commission of the lesser crime and not to the killing, and, at the time of his participation in the lesser felony, had reason to believe his life or the life of another was immediately in danger unless he participated. *People v. Merhige*, 219 Mich. 95, 180 N.W. 418 (1922). *See also People v. Pantano*, 239 N.Y. 416, 146 N.E. 646 (1925). LaFave and Scott explain that "[t]he law properly recognizes that one is justified in aiding a robbery if he is forced by threats to do so to save his life; he should not lose the defense because his threateners unexpectedly kill someone in the course of the robbery and thus convert a mere robbery into a murder." *Id.* at 377. *Accord* Hitchler, *Duress as a Defense in Criminal Cases*, 4 Va.L.Rev. at 528–530 (1917).

■ In this case, Tully's theory of defense asserted he was called out of the bar by Davis, without knowledge that Davis was planning to rob someone. After Davis beat the victim senseless, Tully was forced by Davis, who was still wielding the bloody baseball bat, to rob the dying man. In this case, the evil contemplated by Tully—the robbing of an already mortally injured victim—was certainly less than the threatened harm; that is, his own death or serious bodily injury. Although the subsequent death of Mr. Frick elevated the offense to murder, Tully should not have been deprived of the duress defense.

■ The Attorney General next seeks to support the trial court's ruling by his argument the crime of murder was already complete at the time Tully joined in the fray and, therefore, the duress defense was unavailable. This argument is patently frivolous. Appellant was charged with first degree felony-murder pursuant to 21 O.S. 1981, § 701.7, with the predicate felony as robbery with a dangerous weapon. 21 O.S. 1981, §§ 791, 801. Robbery with a dangerous weapon requires a wrongful taking and carrying away of the personal property of another, from the person, by force or fear involving the use of a dangerous weapon. *Id. Roulston v. State*, 307 P.2d 861 (Okl.Cr. 1957). In this case, it is true that force was employed by Davis prior to Tully's involvement in the crime, according to Tully's testimony. However, Tully claimed he was forced to complete the crime through the taking and carrying away from Mr. Frick of the latter's money. The crime was not complete, as the State alleges, and we reject this argument.

■ Finally, the State argues the duress instruction unavailable to either appellant, because insufficient evidence was presented to support the defense. This Court most recently wrote in *Broaddrick v. State*, 706 P.2d 534 (Okl.Cr.1985) that

This Court has long held that the defendant is entitled, as a matter of law, to have the jury instructed on the law governing his theory of the case if it finds

possible support in the evidence. *Davis v. State,* 665 P.2d 1186 (Okl.Cr.1983); *Cordray v. State,* 268 P.2d 316 (Okl.Cr. 1954). This is even so if the evidence is discredited. *Holt v. State,* 278 P.2d 855 (Okl.Cr.1955):

> While admitting the possession of the Federal liquor stamp, [the defendant] swore that he had quit the liquor business. Of course, defendant may have committed perjury in a number of instances in his testimony. And it is true that the fact of past convictions for crime so weakened defendant's evidence as to credibility that it could easily be said that no jury composed of persons adhering to the oath they were compelled to take as jurors, on a future trial could on the basis of the evidence in the present record, fail to again convict the defendant of the charge here involved. *Still, the jury must be advised of defendant's theory of defense where there is evidence to support it, even though such evidence is discredited.*

*Id.* at 536 (Emphasis added). This writer noted that "[a]ny heavier standard would usurp the sacred obligation of the jury to be the exclusive trier of fact." *Id.* at 538 (Parks, P.J., specially concurring).

In this case, both appellants testified that Davis was a person well known for his explosive temper and propensity for violence. Other witnesses reported that Davis surrounded himself with weapons, and had struck out at various persons, including a pregnant woman. The day before this incident, Davis had attempted to start an altercation with Tully using the baseball bat, according to defense testimony. Defense testimony showed that Davis told Tully he would kill him unless he assisted in the crimes, that Davis jabbed the freshly bloodied bat at Tully to make this point, and further threatened to "ring [Kjelden's] chimes." Furthermore, a psychological profile of Ms. Kjelden was entered into evidence, and revealed that she was easily manipulated by, and terrified of, Davis. Whether or not these allegations raised a "reasonable belief [by Tully or Kjelden] that [they were] in imminent danger of death or great bodily harm from [Davis]", *Oklahoma Uniform Jury Instructions—Criminal,* No. 717, was a question of fact for the jury, and should have been resolved by that body upon proper instruction.

We REVERSE and REMAND this case for a new trial to be conducted in conformity with this opinion.

BRETT, J., specially concurring.

BUSSEY, J., dissents.

BRETT, Judge specially concurring:

I concur in this decision, notwithstanding the fact that the prosecution attempted to downplay the coercive and intimidating capability of codefendant Jim Davis. The record of his trial, judicial notice of which this Court is entitled to rely upon, reflected that he must have been a vicious person.[1] When Davis was being prepared for trial, the Deputy Sheriff inquired, "What shall we do with the defendant?" The Sheriff is reported to have replied, "Shackle the son-of-a-bitch." So he was shackled throughout his trial. At least, that is what the record reflected and as was argued at the motion for new trial at the conclusion of the Davis trial. Consequently, there appears to be little doubt but that Davis strongly impressed or intimidated those around him. They felt he had the capability to carry out his threats. It is not entirely clear in the record of this trial whether or not Davis was shackled during his testimony against these defendants. At least defense counsel Murphy made such a statement during his closing argument, while referring to the testimony of the psychologist Dr. Murphy. He stated, referring to Davis, "They said people like this [Davis] will freak out and do crazy things. That's why Dr. Murphy said he [Davis] wears shackles when he comes into court to testify."

---

1. *Davis v. State,* 709 P.2d 207, 210 (Okl.Cr.1985).

Nonetheless, the defense was based upon the defense of duress.

21 O.S.1981, § 152 provides:

All persons are capable of committing crimes, except those belonging to the following classes.

\*    \*    \*    \*    \*    \*

7. Persons who committed the act, or make the omission charged, while under involuntary subjection to the power of superiors.

21 O.S.1981, § 155, provides:

The involuntary subjection to the power of a superior which exonerates a person charged with a criminal act or omission from punishment therefor, arises from duress.

21 O.S.1981, § 156, provides:

The duress which excuses a person from punishment who has committed a prohibited act or omission must be an actual compulsion by use of force or fear.

Throughout this trial both of these defendants testified that they were fearful of Jim Davis, who committed the violent act by beating the victim to death with a baseball bat. Whether or not their testimony was to be believed was a question of fact for the jury to decide. Without the jury instruction that question was taken away from the jury. In addition to the defendant's testimony, the record is replete with testimony that Jim Davis was a strong, violent and threatening person. The degree of intelligence of Davis, as asserted by the prosecution, was really irrelevant to his capabilities of force. The prosecution argued that he was not intelligent enough to formulate the plan carried out. Again, whether or not he was intelligent enough to exercise force and fear over the defendants was a question of fact for the jury to determine. The jury was denied the power to determine that fact.

The only unique aspect of this decision lies in the first impression effect of duress as a defense to a felony-murder charge. But after considering the facts of this case and after carefully reviewing the record, I am convinced that duress is an available defense to a felony-murder charge, as depicted by the record of this trial.

Therefore, I concur in this decision.