2002 OK CR 12

**Christopher Alan HAWKINS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–2000–769.**

Court of Criminal Appeals of Oklahoma.

March 12, 2002.

Janet Cox, David McKenzie, Assistant Public Defenders, Oklahoma City, Counsel for Appellant at trial.

Marc Pate, Assistant District Attorney, Oklahoma City, Counsel for the State at trial.

Wendell B. Sutton, Assistant Public Defender, Oklahoma County Public Defender's Office, Oklahoma City, Counsel for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Steven E. Lohr, Assistant Attorney General, Oklahoma City, Counsel for the State on appeal.

## OPINION

LUMPKIN, Presiding Judge:

¶ 1 Appellant, Christopher Alan Hawkins, was tried by jury in the District Court of Oklahoma County, Case No. CF–98–736, and convicted of First Degree Murder (Count I), in violation of 21 O.S.Supp.1997, § 701.7, and Conspiracy to Commit First Degree Murder (Count II), in violation of 21 O.S.1991, § 421. The jury set punishment at life imprisonment without parole on Count I and ten (10) years imprisonment on Count II. The trial judge sentenced Appellant accordingly and ordered the sentences to run concurrently. Appellant now appeals his convictions and sentences.

¶ 2 On January 29, 1998, Appellant, Michael Draper, and Zane Johnson went to the home of Wayne Dollar. Appellant fired four shots into Dollar's head while Dollar lay sleeping on a living room couch. He admitted shooting Dollar during subsequent interviews and when he took the stand at trial.

¶ 3 Appellant claimed Draper asked him to shoot Dollar and that Draper would then forgive a debt Appellant owed to him. Appellant claimed he had no choice in the matter: "[I]f I didn't do this either Draper was going to send Dollar after me again or he (Draper) was going to get me."

¶ 4 There was testimony Dollar had fired multiple shots into Appellant's apartment three days before the shooting, using the same gun Appellant used to kill Dollar. A police investigator theorized that Dollar had shot up Appellant's apartment at Draper's request, due to the money Appellant owed Draper.

¶ 5 In his first proposition, Appellant claims the trial court denied him a fair trial, in violation of his federal and state constitutional rights, by admitting videotaped interviews he gave to the police following the incident and photographs of the victim. Prior to the admission of the interviews and photographs, Appellant's counsel lodged timely objections.

¶ 6 Regarding the videotaped interviews, Appellant claims he unambiguously invoked

his right to counsel during his first interview, but then alleges the police reinitiated contact with him, ultimately conducting an interrogation that led to his confession the next day. Appellant claims the interviews should have been suppressed because there was not a sufficient showing Appellant had waived his right to counsel or had reinitiated contact with the police investigators.

¶ 7 The State points out that the trial court held an *in camera* hearing regarding Appellant's waiver and found it was Appellant who reinitiated contact. The State claims this ruling was proper, because the record contains sufficient facts to support the trial court's ruling by a preponderance of the evidence.

¶ 8 Appellant's first interview was held on February 4, 1998 and was terminated when Appellant requested an attorney. Questioning ceased, but the police detectives gave Appellant their number in case he changed his mind. They also informed Appellant he was being booked for first degree murder and warned him that "[o]ther people have been talking. The deals are getting made." The detectives took Appellant's picture, asked him about his hair color, and then left.

¶ 9 Appellant was then taken to jail. According to Detective Matthews, while he was being "booked," Appellant asked if any of the other people had been arrested. Matthews told him yes. Appellant then asked what they had said and whether they were blaming him. Matthews told him he could not discuss this because Appellant had invoked his right to counsel.

¶ 10 According to Matthews, Appellant then said, "Well, I will speak to you now."[1] Matthews testified he told Appellant to "sleep on it" and that they would contact him the next day.[2] (Tr. II at 116–17; P.H.Tr. at 76.) Detective Maddox also recalled Matthews informing him that, during book-in, Appellant had said he had changed his mind

and wished to speak to the detectives. Appellant, however, claimed this exchange never happened and that Matthews made it up.

¶ 11 The second interview occurred the next day, February 5, 1998. Detective Matthews testified at the preliminary hearing that, before the interview began, he made contact with Appellant and confirmed that he still wanted to speak to the detectives. Appellant said, "Yes I do." (Tr. II at 137; P.H.Tr. at 77–78.) At trial, Matthews could not specifically recall this exchange, but he testified that he was sure his preliminary hearing statement was true.

¶ 12 The second interview began with Detective Maddox confirming his understanding that Appellant, at booking, had evidently changed his mind about wanting to speak to investigators without an attorney. In order to confirm whether or not that was true, Maddox informed Appellant that he would start over and read him his rights again. Appellant first nodded, then verbally agreed to this procedure. The *Miranda* warning was given, and Appellant waived his right to an attorney. Thereafter, he made several damning admissions.

¶ 13 Appellant argues the trial court should have focused, not only on whether the statement was given voluntarily, but also upon whether Appellant knowingly and intelligently relinquished his right to counsel. Appellant thus argues his lack of access to counsel, young age, drug dependency, learning disability, parents' divorce, home environment, and ninth grade education must all be taken into consideration. Appellant did not, however, ask the trial court to consider these factors when rendering its decision.[3]

¶ 14 Appellant points to slight inconsistencies in Detective Matthews's story regarding Appellant's alleged re-initiation of contact and to the "incredulous" claim that Appellant was allowed to "sleep on it" as supporting a lack of a knowing and intelligent waiver of

---

1. Matthews's incident report also confirmed Appellant had advised he would like to continue the interview.

2. Matthews testified he normally asked defendants to "sleep on it" when they had previously invoked their right to counsel.

3. Appellant quotes from the presentencing report, which was filed several months after the trial, and citations to the transcripts occurring after the *Jackson v. Denno* hearing to support these factors relating to Appellant's background.

the right to remain silent and right to counsel.

¶ 15   When an accused in custody requests the assistance of counsel the Fifth Amendment requires that all "interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). Furthermore, an accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). · Even if an accused initiates further communication with authorities, his or her waiver of counsel "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards*, 451 U.S. at 482, 101 S.Ct. at 1884, *quoting Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

¶ 16   With this in mind, we find the facts of this case are analogous to those in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) and fall squarely within the law pronounced therein. In that case, the defendant had requested an attorney during his custodial interrogation. Questioning ceased. Thereafter, while the defendant was being transferred to the county jail, he asked an officer "what is going to happen to me now?" The officer replied that the defendant did not have to talk to him and that, because he had requested counsel, his desire to speak to the officer had to be of his own free will. After indicating he understood, the officer and defendant discussed where the defendant was being taken, with what he was

being charged, and the possibility of his taking a polygraph test to help himself. The defendant agreed to take the test. The following day, after being given the *Miranda* warning, the defendant took the test. After the examiner told the defendant he did not believe he was telling the truth, the defendant made some damning admissions.

¶ 17   In its plurality opinion, the Supreme Court found these facts did not constitute a violation of the *Edwards* rule:

There can be no doubt in this case that in asking, "Well, what is going to happen to me now?", respondent "initiated" further conversation in the ordinary dictionary sense of that word. While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in *Edwards*.

Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation.

*Oregon v. Bradshaw*, 462 U.S. at 1045–46, 103 S.Ct. at 2835.[4]

4.   The dissent, in *Oregon v. Bradshaw*, had a more stringent view of what was required for a defendant to initiate further communication, i.e. the communication had to be "about the subject matter of the criminal investigation." 462 U.S. at 1053, 103 S.Ct. at 2839. Thus, the four dissenters did not believe the defendant's open-ended question, "what is going to happen to me now?", qualified as the initiation of further communication. However, even using the more-

■ ¶ 18   This case is sufficiently similar in terms of facts. While there was a dispute over whether Appellant actually spoke to Detective Matthews during booking, the trial judge, who was the trier of fact with respect to this question, heard testimony from Matthews that Appellant asked about who else had been arrested and whether or not he had been blamed. Matthews testified Appellant said he desired to speak to Matthews "now". This testimony was supported by at least one document and testimony from Maddox. While Appellant testified no such conversation ever occurred, the trial judge had the benefit of hearing the evidence and assessing the weight and credibility of the testimony. We find the trial judge's ruling that Appellant reinitiated communication to be factually and legally supported by the record. No *Edwards* violation occurred.

¶ 19   This, however, does not end our inquiry. We must now determine "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Oregon v. Bradshaw*, 462 U.S. at 1046, 103 S.Ct. at 2835. This determination depends "upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023.

¶ 20 ·  Here, the trial court, based upon the "totality of the circumstances and looking at all of the testimony that I have had here today," found that Appellant's decision to speak to the detectives, thereby waiving his right to silence and right to counsel, was voluntary, without coercion, without being under the influence of drugs or alcohol, and given at a time when Appellant was coher-

ent.[5] While there was no specific discussion of many of the factors Appellant mentions in his appellate brief, the trial judge had available to him information regarding Appellant's age, his competency evaluation, his previous contacts with the law, his ability to understand the charges against him, his drug dependency, his family problems, and his "paranoia and disordered thinking." We do not second guess a trial judge who was presented this evidence during the course of a hearing and we presume the judge considered such factors in entering his ruling.

¶ 21   Considering the totality of the circumstances, including Appellant's background, experience, conduct, and his own testimony (Tr. III at 87), we find the trial judge's ruling is sufficiently supported, by a preponderance of the evidence, and that the Appellant's waiver of the right to remain silent and the right to counsel was entered knowingly and intelligently.

■ ¶ 22   Regarding the admission of the photographs of the deceased, we find the probative value thereof was not substantially outweighed by the danger of unfair prejudice. 12 O.S.1991, § 2403. While Appellant admitted the shooting, he also raised concerns about duress and heat of passion. Furthermore, the position of the body was helpful in determining the circumstances of the crime, and the photographs helped to corroborate Appellant's confession.

¶ 23   In proposition two, Appellant claims the trial court committed reversible error by denying his requested jury instructions on duress and the lesser offense of first degree manslaughter, in violation of the federal and state constitutions.

■ ¶ 24   Regarding duress, Appellant argues he was entitled to an instruction on this complete defense where there is any possible support for it in the evidence, even if discredited.[6] To support his claim that the

stringent definition set forth in the dissent, hypothetically, Appellant's questions regarding who had been arrested and whether or not he had been blamed would clearly be about the subject matter of the criminal investigation and constitute the initiation of further communication.

5.   This ruling is strikingly similar to the one entered by the state court in *Oregon v. Bradshaw*, a ruling that the Supreme Court let stand.

6.   *See, e.g., Nance v. State*, 1992 OK CR 54, 838 P.2d 513, 515; *Hunter v. State*, 1992 OK CR 19, 829 P.2d 64, 68; and *Broaddrick v. State*, 1985 OK CR 108, 706 P.2d 534, 536.

evidence at trial required the giving of a duress instruction, he points to the following facts in the record: Appellant had been buying methamphetamine from Michael Draper, selling drugs for Draper, and owed money to him as a consequence; Draper was known to have a bad temper; Appellant told Draper he was unable to pay for the drugs he had received; two days later, his apartment was shot up while he was inside, and the same gun later given to him by Draper to kill Dollar was used; Draper called Appellant and asked him to come over so they could discuss his debt; Draper told him "he had a way for me to pay off the debt;" Draper then told him that Dollar had ripped Draper off and had shot up Appellant's apartment; he went with Draper and Zane Johnson to Dollar's apartment, thinking they were only going to scare Dollar; Johnson told Draper he could let Appellant "do it to knock off the debt;" Johnson and Draper both had guns; Draper handed him his gun and asked, "Are you going to do this?"; Appellant took the gun, thinking he had no choice in the matter because Draper would get him or send Dollar to get him; he shot without thinking and because he was scared of "losing my life;" and he specifically testified that he acted in a heat of passion, out of pressure put on him by Draper, and out of fear that it would be his life or Dollar's.

¶ 25 But there are other important facts from the record to consider. Appellant admitted there was talk about killing Dollar before they even went to his apartment that night. During his confessions to police, Appellant did not claim he acted out of fear. Furthermore, there was never any claim, during the confessions or at trial, that an actual or even an implied threat was made against Appellant. Indeed, it appears highly likely Appellant was acting out of monetary pressure, rather than a sense of imminent danger. (He testified that, while most people work to pay off their bills, "I had never ever really have (sic). been able to keep a job.") Draper, the person Appellant allegedly feared, was in a car a considerable distance away when Appellant shot the sleeping victim four times in the head. Draper had given Appellant his gun, leaving Appellant armed and Draper disarmed. Additionally, although Appellant had seen Draper "blow up" at Draper's wife, he had never seen Draper threaten anyone who owed him money—he had only "heard stories." Furthermore, Appellant never testified he knew Draper had instructed Dollar to shoot up his apartment—he only knew Draper said that Dollar, whom he had never met, collected for him on occasion. In fact, according to his testimony, he never really thought about any of these things; he just took the gun and shot in a spur-of-the-moment manner.

¶ 26 There has been some debate in this Court over the years about whether or not the affirmative defense of duress is available to one charged with first degree malice murder.[7] The most recent pronouncement on this issue, adopted by two current members of this Court, says that it is.[8] Even then, it is available in an extremely limited set of circumstances.

¶ 27 We need not revisit this issue today, however, because the record before us shows the trial judge did not abuse his discretion in denying a duress instruction under the facts of this case, even if one was hypothetically available.

¶ 28 According to 21 O.S.Supp.1992, § 156, duress requires the defendant to have committed a prohibited act or omission "because of a reasonable belief that there was imminent danger of death or great bodily harm from another upon oneself, ones spouse, or ones child." Here, the record indicates Appellant committed the act because of his drug habit and unpaid debt; He

---

7. *See, e.g., Spunaugle v. State,* 1997 OK CR 47, 946 P.2d 246, 250("We find the defense of duress is available in Oklahoma to a defendant charged with the crime of first degree malice murder."); *Spunaugle,* 946 P.2d at 256 (J. Lumpkin dissenting)("the defense of duress is not applicable to first degree malice aforethought murder."); *Tully v. State,* 1986 OK CR 185, 730 P.2d 1206, 1210 (discussing how the common law's, and hence Oklahoma's, rationale for denial of the duress defense to intentional killing "is premised on the theory that one should risk or sacrifice one's own life rather than take the life of an innocent person.")

8. I continue to disagree, however, for the reasons stated in my dissent in *Spunaugle.*

did not shoot with a reasonable belief of imminent danger. Draper had left the scene and had turned over his weapon. · At best, this indicates Appellant feared some future, hypothetical action from Draper, a man whom he had never seen take such action.

¶ 29 Moreover, Appellant cannot be said to have been under the "involuntary subjection" of a superior power.[9] He came along willingly, following discussion of killing Dollar, in hopes of gaining by extinguishing his debt. He was never threatened or bullied. There is no indication Draper was a superior power.

¶ 30 Finally, *Spunaugle* recognizes that a person who fails to avail himself of an opportunity to escape from a situation of duress is not entitled to claim the defense. Appellant had that opportunity when he was left alone with a weapon.

¶ 31 Next, Appellant claims he should have been given his requested instruction for first degree "heat of passion" manslaughter as a lesser-included or lesser-related offense.[10] He claims "in light of the evidence of duress and fear and terror on the part of Mr. Hawkins toward Michael Draper and the decedent," a rational juror could have found him guilty of first-degree manslaughter and the absence of that instruction was a violation of due process.

¶ 32 This claim fails for several reasons. First, first degree manslaughter, by definition, requires the killing to have been committed "in the heat of passion" and "without a design to effect death." 21 O.S.1991, § 711. It can hardly be suggested there was no design to effect death here.

¶ 33 Secondly, heat of passion requires adequate provocation *on the part of the deceased* toward the defendant, not some implied provocation on the part of a third person sitting in a car a considerable distance away. *Williams v. State*, 2001 OK CR 9, 22 P.3d 702, 713; *Black v. State*, 2001 OK CR 5, 21 P.3d 1047, 1067. Here, the victim was asleep on the couch when Appellant fired four shots into his head. While it is true the victim allegedly shot up Appellant's apartment, that event occurred three days earlier. Moreover, Appellant had been told Dollar committed the action before he even went to Dollar's apartment.

¶ 34 Thus, there was more than a reasonable opportunity for any passion on the part of Appellant to cool. In Oklahoma, a homicide must occur while the passion still exists and before a reasonable opportunity for the passion to cool. *Williams*, 22 P.3d at 713.

¶ 35 We find the trial court did not abuse its discretion in refusing to give a first degree heat of passion manslaughter instruction, and, consequently, Appellant suffered no deprivation of his due process rights.

¶ 36 In proposition three, Appellant claims the evidence was insufficient to establish the *corpus delicti* of a conspiracy to commit first degree murder, apart from his own confessions. In other words, he claims the State failed to present sufficient independent evidence that an agreement to kill Dollar existed and that Appellant was a party to that agreement at the time it was made.

¶ 37 In *Fontenot v. State*, 1994 OK CR 42, 881 P.2d 69, 77–78, this Court rejected the *corpus delicti* line of analysis and reaffirmed this Court's prior adoption of the "standard which requires only that a confession be supported by 'substantial independent evidence which would tend to establish ... [its] trustworthiness....' *Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954), adopted in *Jones v. State*, 555 P.2d 63, 68 (Okl.Cr.1976)."

¶ 38 We find the following substantial independent and corroborating evidence sufficient to establish the trustworthiness of Appellant's confessions: the victim was found on the couch in the living room; he appeared to have been shot while sleeping; his body was covered by a blanket; he had been shot four times in the head; a .38 caliber revolver was used; the shooter appeared to have stood above the victim; the door to the victim's residence was found unlocked, without

9. *See* 21 O.S.1991, § 152(7); 21 O.S.1991, § 155.

10. *See Shrum v. State*, 1999 OK CR 41, 991 P.2d 1032, 1036.

any sign of forced entry; the screen door to the victim's residence was found propped open; co-defendant Zane Johnson's fingerprints were found on an unscrewed, but working, porch light bulb at the residence; a dog was found locked in the utility room; a television was on when the victim was found; police interviews with several possible suspects led to Appellant as a possible suspect; bullets taken from the victim's head were an exact match to bullets found at the Casa Cortez apartments, where Appellant lived; Appellant's apartment had been shot up three days before the victim was killed; police investigations indicated Michael Draper came up with the idea to kill the victim; and both Appellant and the victim owed money to Draper relating to drugs. Furthermore, Appellant testified at trial that his confessions were "pretty much" accurate.

¶ 39 We find, after viewing the evidence in the light most favorable to the State and accepting all reasonable inferences and credibility choices that tend to support the jury's verdict, any rational trier of fact could have found the essential elements of the crime of conspiracy beyond a reasonable doubt. *Spuehler v. State*, 1985 OK CR 132, 709 P.2d 202, 203–204. The information provided Appellant with sufficient notice of what he had to defend, a conspiracy charge concerning an agreement to kill Wayne Dollar on January 29, 1998. At trial, Appellant admitted there were discussions about shooting Dollar while the group was still at Michael Draper's house. We do not find it legally significant that Appellant's trial testimony postponed the agreement a short amount of time or contended that the overt act occurred when Appellant took the gun from Draper, rather than when they drove over to the victim's home. We find Appellant's conspiracy conviction does not violate due process.

¶ 40 In proposition four, Appellant claims he was denied effective assistance of counsel under the federal and state constitutions, by the following acts of counsel: coming "perilously close" to conceding guilt to first degree murder during closing argument; unequivo-

cally conceding guilt to conspiracy during closing arguments; the inability to effectively advocate duress due to the trial judge's denial of an instruction on that defense; and failing to object to *corpus delicti* for conspiracy and/or the use of Appellant's statements without substantial independent evidence of an agreement to kill Dollar and Appellant being a party to that agreement at the time that it was made.

¶ 41 We find, however, Appellant's counsel was not ineffective. First, given the fact that Appellant confessed to the murder before and during trial, it can hardly be said counsel's arguments on this point, some of which are taken out of context by Appellant, could have done anything but come "perilously close" to admitting guilt. Second, we find a reasonable trial strategy in conceding guilt to the lesser conspiracy charge during closing arguments, considering Appellant's confession and trial testimony.[11] We have previously found the trial court did not abuse its discretion in denying a duress instruction. Third, while appellate counsel has made well-reasoned arguments regarding the sufficiency of the evidence of conspiracy, those arguments have been rejected. Trial counsel was not ineffective for failing to raise those same or similar arguments. Appellant has thus failed to show his counsel's representation fell below an objective standard of reasonableness or that any errors by counsel were so serious as to deprive Appellant of a fair trial, a trial whose result is reliable. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

¶ 42 In proposition five, Appellant claims the trial court denied him his right to a fair trial and due process, in violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, §§ 7, 9, 19, and 20 of Oklahoma's Constitution, by denying his motion for new trial. His motion was based upon the trial judge's response to the jury's questions, "What is life in years?" and "What is life without parole in years?" The motion was also based upon the jury's consideration of alleged "extraneous matters

---

11. Appellant's request for an evidentiary hearing on this issue, relating to his counsel's alleged failure to obtain his consent before conceding guilt on the conspiracy charge is denied, considering the entire record, Appellant's statements, and his testimony at trial.

and influences" in the form of the jurors' opinions that punishment of life without parole meant a defendant could be released after serving a certain terms of years.

¶ 43 At trial, when the jury's note was received, the trial judge informed them in writing, "This is not for your consideration." [12] There is no indication in the record that defense counsel objected to this response. Thus, we review for plain error. *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, 693.

¶ 44 Appellant points to unsworn telephone interviews with ten jurors and an affidavit from a Public Defender's investigator detailing the results of his investigation, all of which were filed with the motion for new trial, as support for his claim that jurors were confused about what life and life without the possibility of parole meant.[13]

¶ 45 However, according to our evidence code, when there is an inquiry into the validity of a verdict, a juror is incompetent to testify about "any matter or statement occurring during the course of the jury's deliberations or as to the effect of anything upon his or another juror's mind or emotions as influencing him to assent to or dissent from the verdict . . . or concerning his mental processes during deliberations." 12 O.S.1991, § 2606(B). A juror may testify about "extraneous prejudicial information," i.e. information injected into the deliberation process from the outside, but we do not believe this includes information coming from the juror's own subjective experiences and background,

as here. Moreover, in difficult line-drawing cases, the line should be drawn in favor of juror privacy, and the testimony should be disallowed. *Weatherly v. State*, 1987 OK CR 28, 733 P.2d 1331, 1335.

¶ 46 This Court has, in numerous instances, stated that the meaning of life without parole is self-explanatory and that an instruction on its meaning is not required. *Powell v. State*, 2000 OK CR 5, 995 P.2d 510, 536, *cert. denied*, 531 U.S. 935, 121 S.Ct. 321, 148 L.Ed.2d 258 (2000); *Howell v. State*, 1998 OK CR 53, 967 P.2d 1221, 1224-25, *cert. denied*, 528 U.S. 834, 120 S.Ct. 93, 145 L.Ed.2d 79 (1999); *McCracken v. State*, 1994 OK CR 68, 887 P.2d 323, 334, *cert. denied*, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995). We need not revisit that issue here.

¶ 47 Appellant points out, however, that the "clarifying instruction" set forth in *Johnson v. State*, 1996 OK CR 36, 928 P.2d 309, 320 was not used, although he acknowledges that such an instruction is not required. He then states the trial court "could have, and should have," instructed as follows:

A life sentence means imprisonment for the balance of the defendant's natural life with the possibility of being considered for parole by statute after serving fifteen years imprisonment. A life without parole sentence means imprisonment for the balance of the defendant's natural life without the possibility of ever being considered for parole.

Of course Appellant did not request this instruction. Although we see no immediate

---

**12.** Appellant suggests, in his brief, that the question asked and the answer given raises an issue similar to that in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). We disagree. *Simmons* dealt with a capital trial, where the defendant's future dangerousness was at issue but the jury was never informed the defendant was parole ineligible. Here, the death penalty and statutory aggravating circumstances are not an issue. Furthermore, the specific question asked was to define the two sentencing options, i.e. life and life without parole, in a specific number of years that would be served. The precise number of years to be served is not a proper question, however, and the trial judge correctly advised the jury it was not for their consideration. The trial judge did not, in any way, tell the jury they could not consider the issue of parole in their delibera-

tions. Indeed, the jury's ability to consider that issue was inherent in Jury Instruction 27, which stated that "Murder in the First Degree is punishable by Life or Life without the possibility of parole." We find this instruction is a constitutionally-sufficient explanation of the jury's sentencing options and certainly no violation of *Simmons* or its progeny.

**13.** The telephone interviews, if accurate, indicate some jurors believed life imprisonment without the possibility of parole meant exactly what it says, that the defendant would never be a candidate for parole, while others believed a person still might be paroled after serving a certain amount of years (although some of these believed it was possible that a defendant might not ever get out of prison).

problem with this instruction, it cannot be said Appellant was denied a constitutional right by the trial court's failure to issue this instruction *sua sponte*, especially in light of our previous cases on this issue.

¶ 48 With respect to proposition six, we find Appellant's sentence of life imprisonment without parole, although severe, was not so excessive as to shock the conscience of the Court. *Rea v. State*, 2001 OK CR 28, 34 P.3d 148, 149; *Freeman v. State*, 1994 OK CR 37, 876 P.2d 283, 291. While Appellant may not have any prior felony convictions, the record indicates he previously received a deferred sentence relating to burglary and concealing stolen property charges, and said sentence had not been resolved at the time the instant crime was committed. Appellant also has a history in the juvenile court system. His actions in firing four bullets into the head of a sleeping victim indicate he is willing to commit the most serious of crimes over drugs and his own indebtedness.

¶ 49 With respect to proposition seven, we find no cumulative error. With respect to proposition eight, we find Appellant's conviction for conspiracy and murder do not violate state and federal prohibitions against double jeopardy. This Court has consistently held that "a conspiracy to commit an unlawful act constitutes an independent crime, complete in itself and distinct from the unlawful act contemplated." *Littlejohn v. State*, 1998 OK CR 75, 989 P.2d 901, 909–10; *Huckaby v. State*, 1990 OK CR 84, 804 P.2d 447, 450.

### DECISION

¶ 50 The judgments and sentences are hereby **AFFIRMED.**

JOHNSON, V.P.J., and LILE, J., concur.

STRUBHAR, J., concur in result.

CHAPEL, J., concur in part/dissent in part.

STRUBHAR, Judge: Concur in Results.

¶ 1 I concur in results only for the reason of *stare decisis*. I continue to believe that a trial court should provide a meaningful answer to questions from the jury when they ask about the meaning of life without parole.

CHAPEL, J., Concurring in Part and Dissenting in Part.

¶ 1 I concur in affirming Hawkins's murder conviction. However, I dissent to affirming (a) his conviction for conspiracy to commit murder and (b) the sentence of life without parole. First, I continue to believe that convictions for murder and conspiracy to commit murder violate the prohibition against double jeopardy.[1] I would reverse Hawkins's conspiracy conviction. Further, I have consistently stated that the jury should be informed of the meaning of life without parole.[2] In *Malicoat*, I said, "Our error in failing to require instruction as to the meaning of life without parole is of constitutional magnitude and has, in my judgment, resulted in death sentences for many who would otherwise have received the life without parole sentence."[3] Although this is not a capital case, the principle applies. When a jury asks a question about the term of incarceration meant by life with parole, as these jurors did, it means the jurors are confused. Juror confusion may well result in a longer sentence. Where the trial court can clear up

1. *Moss v. State*, 1994 OK CR 80, 888 P.2d 509, 522 (Chapel, J., concurring in part and dissenting in part).

2. *See, e.g., Powell v. State*, 2000 OK CR 5, 995 P.2d 510, 543, *cert. denied*, 531 U.S. 935, 121 S.Ct. 321, 148 L.Ed.2d 258 (2000) (Chapel, J., dissenting); *Ochoa v. State*, 1998 OK CR 41, 963 P.2d 583, 605 n. 100, *cert. denied*, 526 U.S. 1023, 119 S.Ct. 1263, 143 L.Ed.2d 358 (1999); *Mollett v. State*, 1997 OK CR 28, 939 P.2d 1, 15, *cert. denied*, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998) (Chapel, J., concurring in result); *Johnson v. State*, 1996 OK CR 36, 928 P.2d 309, 321, *cert. denied*, 522 U.S. 832, 118 S.Ct. 99, 139 L.Ed.2d 54 (1997) (Chapel, J., specially concurring); *Smallwood v. State*, 1995 OK CR 60, 907 P.2d 217, 239, *cert. denied*, 519 U.S. 980, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996) (Chapel, J., specially concurring); *McGregor v. State*, 1994 OK CR 71, 885 P.2d 1366, 1383 n. 59, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995) (concurring by reason of stare decisis).

3. *Malicoat v. State*, 2000 OK CR 1, 992 P.2d 383, 400 n. 43, *cert. denied*, 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146 (2000).

juror confusion, it should.[4] I would remand for resentencing with appropriate instructions.[5]

---

**4.** "A trial court has a duty of special care to evaluate jurors' understanding of the law and clear away any explicit difficulties." *Hooks v. State*, 2001 OK CR 1, 19 P.3d 294, 312, *cert. denied*, —— U.S. ——, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001); *Weeks v. Angelone*, 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000); *Bollenbach v. United States*, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946).

**5.** As the majority notes, six years ago we suggested the standard instructions on punishment could be clarified by defining life both with and without parole. *Johnson*, 928 P.2d at 320.

